VIRGINIA D. SMITH ET AL. *vs.* JOSHUA HUMPHREYS
ET AL.

*Witness—Competency—Transaction With Decedent—Testimony Compe-
tent in Part—General Exception—Cancellation of Instruments—
Insufficiency of Evidence to Prove Contract to Make a Will.*

In a suit to enforce an alleged agreement made by a deceased intestate
with the plaintiff, the latter is not a competent witness to testify as to
any transaction had with or statement made by such decedent. But
the plaintiff is competent to testify as to other matters.

Under Code, Art. 35, sec. 3, a nominal party is not excepted from the ·
disability thereby imposed upon the parties to the cause to testify as to
transactions had with, or statements made by a decedent in proceed-
ings by or against the personal representatives or heirs of such deced-
ent in which judgment may be rendered for or against them.

When a witness is incompetent to testify as to some matters but is com-
petent as to others, and his testimony as given relates to both matters,
then a general exception to all of his testimony will not be sustained.
The exception in such case should designate the questions and answers
objected to on the ground of the incompetency of the witness.

A person of average intelligence and able to read who asks to be relieved
from the effect of a paper signed by him on the ground that he did not
read it must establish a very clear case of mistake or imposition before
he is entitled to the aid of a Court of equity.

A woman died intestate leaving a husband and a daughter by a former
marriage. The husband as her administrator received possession of
two certificates of city stock each for $3,000. Under the then existing
law he was entitled to a life estate in the whole sum of $6,000, which
upon his death would go to the daughter. The Orphans' Court au-
thorized the husband to transfer one of the $3,000 certificates to himself
individually and the other to the daughter, and the latter executed a'
release stating that she had purchased the former's life estate for the
sum of $3,000. After the death of the husband intestate the daughter
filed the bill in this case alleging that she had executed the release
upon the understanding that what her stepfather received was to be en-
joyed by him during his life and at his death the same was to be re-
turned to her; that she had not read the release but supposed it was as
thus represented. The bill prayed that the release be cancelled and
that the agreement to return the $3,000 be specifically enforced. *Held*,
that the plaintiff is not entitled to the relief asked for since the evidence
fails to prove that the deceased administrator agreed, as a considera-

tion for the release or for the transfer to himself of one of the certificates absolutely, that he would leave it by will or otherwise, after a life estate, to the plaintiff, and that the most that can be deduced from the testimony is that he left the plaintiff under the impression that he would so leave it, without in any way binding himself or his estate to make such a disposition of the certificate.

*Decided November 15th, 1906.*

Appeal from the Circuit Court of Baltimore City (STOCK-BRIDGE, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*John B. Gray* and *Walter I. Dawkins*, for the appellants.

*James M. Munroe* and *George Forbes*, for the appellees.

BOYD, J., delivered the opinion of the Court.

Mrs. Eliza A. Bowen married Edward S. Humphreys and died in 1896 leaving her husband and Mrs. Smith, one of the appellants, who was her only heir at law and next of kin, surviving her. Mr. Humphreys qualified as administrator of her estate and received into his possession two certificates of Baltimore City stock, each for the sum of three thousand dollars, together with some other property for which he was charged in his account $623.05. By that account, which was settled August 10th, 1897, there was a balance shown to be due the estate of $6,088.79, after deducting funeral expenses, commissions, costs, etc. On the 12th day of July, 1898, he settled another account in the Orphans' Court, in which he was charged with the above balance and that sum, less fees to the Register of Wills, was credited as follows: "For amount paid Virginia D. Smith, the only surviving child of Eliza A. Humphreys, as per release filed and recorded July 12th, 1898, $6,086.29." The release was executed by the appellants, was acknowledged before a Justice of the Peace and recites that they had received of Edward S. Humphreys, adminis-

trator, the above sum of $6,086.29, in which said Humphreys "has by virtue of law a life estate, and which said life estate the said Virginia D. Smith has this day purchased of the said Edward Humphreys, at and for the sum of three thousand and forty-four and thirty-nine one-hundred dollars." Prior to that time, on September 28th, 1897, the Orphans' Court had authorized and directed the administrator to transfer to himself individually, one of the certificates of Baltimore City stock for $3,000 and the other, for a like sum, to Mrs. Smith, which was done.

In February, 1904, Mr. Humphreys died in the city of Baltimore, and on the 11th of January, 1905, this bill was filed by Mr. and Mrs. Smith against Joshua Humphreys, individually, and as administrator of Edward S. Humphreys, Mrs. Dove, a sister, and M. F. Humphreys, a brother of Edward S. It alleges among other things, "That in order to facilitate the settlement of the estate of her mother, as your oratrix was informed was right and proper by the said Edward S. Humphreys, and with the distinct understanding and agreement with the said Edward S. Humphreys that what he received in the way of personalty from her mother's estate was to be enjoyed by him during his lifetime, and that at his death the same was to be returned to her." She and her husband executed the release. It further alleges that neither of them read the release, or had it read to them, having full confidence in and trusting Edward S. Humphreys implicitly, and supposing that it was as represented, and "otherwise she and her husband would not have signed the said paper and it was signed by mistake, and under misapprehension of its true meaning and import."

It is also alleged in the bill that many of the papers and the trunks of Edward S. Humphreys were destroyed by the fire in Baltimore in February, 1904, and that Mrs. Smith had every reason to believe that if such calamity had not occurred "some memoranda or paper would have been among his effects returning to her the property so belonging to her and so agreed to be returned," but in the absence of it, the adminis-

trator took possession of all his effects, including the certificate of Baltimore City stock, and distributed the estate after deducting expenses, etc., to the next of kin of Edward S. Humphreys—the certificate of stock being valued in the account at $3,577.50. The prayers of the bill are: (*a*) "That the said agreement may be specifically performed and enforced," and that the administrator may be required to turn over to Mrs. Smith any portion of the estate he has in hand, or which has been illegally paid away, to the value of the Baltimore City stock, and also the further sum of $86.29, received by said Edward S. Humphreys from the estate of his wife; (*b*) That the three next of kin may be required to turn over to her the portion of the personal estate of Edward S. Humphreys received by them to the amount of $3,663.79; (*c*) That said sum be decreed to be a lien or charge upon all the estate and property of Edward S., passing to the three defendants; (*d*) That the release be cancelled and set aside; (*e*) That the defendants be restrained from disposing of any property or estate received by them from the estate of Edward S., and (*f*) For general relief. Answers were filed by the defendants, testimony taken, and after hearing, the bill of complaint was dismissed by a decree of the lower court. From that decree this appeal was taken.

1. Exceptions were filed to the testimony of Mrs. Smith on the ground that she was an incompetent witness, and also to certain specified questions and answers for other reasons. These and other exceptions do not appear to have been acted upon by the learned Judge below, but it is clear that Mrs. Smith was not a competent witness as to the execution of this release, or the alleged agreement made with Edward S. Humphreys. The statute in force when this bill was filed (1904, ch. 661, now sec. 3 of Art. 35 of the Code), provides that "In actions or proceedings by or against executors, administrators, heirs, devisees, legatees, or distributees of a decedent as such, in which judgments or decrees may be rendered for or against them, and in proceedings by or against persons incompetent to testify by reason of mental disability, no party to the cause

shall be allowed to testify *as to any transaction had with, or statement made by the testator, intestate, ancestor,* or party so incompetent to testify, either personally or through an agent since dead, lunatic or insane, unless called to testify by the opposite party," etc. As this bill seeks to have a decree rendered against the administrator and the distributees of Edward S. Humphreys, the statute in terms prohibits the plaintiffs from testifying as to any transaction had with, or statement made by the deceased, and it is clear that Mrs. Smith was not competent to testify as to the release, or any promise or statement by Mr. Humphreys in reference to it. The present statute, however, does not make parties to a cause incompetent to testify as to all matters, but it expressly limits their incompetency, as above stated. Under the Code of 1888 a party to the suit was incompetent to testify when an original party to a contract or cause of action was dead or insane, and when an executor or administrator was a party to a suit, excepting as therein provided for. That was materially changed by the Act of 1902, ch. 495, and the only changes made by the Act of 1904 in the Act of 1902 were inserting after "administrators," "heirs, devisees, legatees or distributees of a decedent as such," and adding the word "ancestor" after "intestate." The appellees are therefore in error when they say in their brief that the Act of 1904 restored the provisions omitted from the Act of 1902, and as they excepted to "all the testimony" of Mrs. Smith "on the ground of her incompetency to testify as a witness in this case," such exception conld not be sustained, if she testified to anything that the statute does not prohibit, because it is too general. Under such an exception the Court is not required, and it cannot be expected, to go through the testimony and pick out such questions as are objectionable because the witness is incompetent to speak of the subject referred to. If a witness is incompetent to testify at all, then an exception to the whole testimony of such witness on the ground of his incompetency should be sustained, as was done in *Johnson* v. *Heald*, 33 Md. 352, but that does not apply when the witness, as in this case,

was competent for some purposes. In *Dilley* v. *Love*, 61 Md. 607, it was held that although the witness was incompetent to testify at all, yet inasmuch as the exceptions were confined to certain questions and answers, those not excepted to were to be taken as evidence in the case. The Court said it was competent for the party filing the exceptions "to waive the statutory exclusion *pro tanto*, and confine his exceptions to such portions of the testimony as make against him, or as he may deem objectionable." Mrs. Smith was clearly competent to testify as to her mother's death, what children she left, her own age, etc., and we are of the opinion that the defendants should have excepted to designated questions and answers, on the ground of the incompetency of the witness, if they desired the exceptions to be passed on by the Court below, or by this Court, and not having done so they cannot be excluded under that general exception to her incompetency as a witness. There were some special exceptions filed to certain questions and answers for reasons assigned, but we do not deem it necessary to pass on them, as it would unnecessarily prolong this opinion, and moreover we are satisfied that the plaintiffs are not entitled to the relief sought, if all the evidence excepted to be considered. We have deemed it proper to refer to the question of the competency of Mrs. Smith at some length, because there seems to be some misapprehension of the meaning of the statute now in force and as to the correct practice in such cases. It is only necessary to add, in reference to Mr. Smith, that the Act of 1904 does not, as the Code of 1888 did, except "a nominal party."

2. Any person who comes into a Court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the Court because he did not read a paper involved in the controversy, and was thereby imposed on, should be required to establish a very clear case before receiving the assistance of the Court in getting rid of such document. It is getting to be too common to have parties ask Courts to do what they could have done themselves, if they had exercised ordinary prudence, or, to state it in an-

other way, to ask Courts to undo what they have done by
reason of their own negligence or carelessness.    But in this
case there is no evidence of any imposition upon Mrs. Smith
by Mr. Humphreys. With the exception of not making some
provision for her by a will "or something to that effect," as
she speaks of it, he apparently did everything she says he
agreed to do, and she excuses him as to that by alleging in
her bill and testifying that she had every reason to believe that
if the fire in Baltimore had not destroyed his papers, some
memoranda or paper would have been among his effects, for
the purpose of returning the property she claims he was to
leave her.    The allegations in paragraph four of the bill show
that Mrs. Smith understood the contents of the release.    It
alleges that she and her husband executed "a paper under
date of July 7th, 1898, in the nature of a release stating that
the life estate of the said Edward S. Humphreys was pur-
chased by your oratrix for the sum of "$3,044.49, and releas-
ing him from any further claim or demand for or on account
of the sum of" $6,086.29, in order to facilitate the settlement
of the estate, and by reason of the understanding and agree-
ment she had with him as stated above.    It is not proven that
she thought that the agreement was in the release, and if her
allegations in that paragraph are to be accepted, she and her
husband signed the release with full knowledge of what it
contained, whether they read it or not.

Her testimony also shows that she must have known the
effect of the release—that it vested the one-half of the estate
in Mr. Humphreys absolutely and not merely for life, for she
testified that she expected him to make a will.    She said "I
had not the slightest doubt of a will, giving the entire prop-
erty to my family."    After saying that on cross-examination,
her counsel asked her this question, "You state that you have
not the slightest doubt that Mr. Humphreys left a will, or
something to that effect, showing that he intended all of his
property for your family.    Will you give your reasons for
making this statement?" To which she replied, "Well, from his
expressions to different ones that what he got from the family

should revert to the family, and his devotion to the family; all of his spare time from business was spent with us, his vacation in summer." Another witness offered by the plaintiffs testified that Mr. Humphreys said "I will give these bonds to no one, but will keep them to collect the interest on them, but I am ready to sign a will at any moment giving all the bonds to Mrs. Smith or to her oldest daughter." He could not have willed the stock to Mrs. Smith or her daughter, unless it was his, yet her testimony shows that she expected him to leave it to her or her family by a will, or something to that effect. It may be true that he did intend to leave it to her or her family by a will, and it is possible that such a will was made and destroyed by the fire, but it can hardly be claimed that this bill can be sustained, if either of those possibilities be conceded to be facts. The release does not show that it was executed for such a consideration, and as we have intimated, the evidence does not sustain that contention, but at most only shows that Mr. Humphreys said he would leave the stock to her or her family.

The surrounding circumstances tend to refute any suggestion that he ever bound himself to leave the stock to Mrs. Smith in consideration of her executing the release, or allowing him to have the certificate of stock. The release itself not only sustains the contrary view, but what possible reason can be suggested for Mr. Humphreys making such an agreement? He was entitled to interest on *the whole sum* during his life, and at his death it would have passed to Mrs. Smith without a will, or any act of his. The law in force at the time of his wife's death gave it to him for life and to Mrs. Smith at his death. Can it be imagined that after surrendering his life interest to one-half of the estate, that he would, in order to induce her to execute the release, or give him the other half, take that in his own name, subject to an agreement that Mrs. Smith or her family should have it at his death? There was no occasion for any transfer to him, unless it was intended to do exactly what the release in substance says was done—that she paid him one-half of the balance of the estate for the release

of his life estate in the other half in order that she might get it at once, instead of waiting until his death.    He did not die until over six years after the Orphans' Court authorized that settlement and might have lived for many years, so far as they could then know.    He was holding the whole sum and getting interest thereon and had the right to do so, in the way it is now claimed he bound himself to hold the half.    If he wanted to get rid of all responsibility of it, he could have had some one else appointed, or he and Mr. and Mrs. Smith could have deposited the certificates of stock with some reliable bank or trust company, with an agreement that he should have the interest for life and at his death the certificate should be delivered to Mrs. Smith.    Under all these circumstances, Mr. Humphreys had the right to suppose that she and her husband understood what was done, and it is impossible to reach any other conclusion from the evidence.    If Mr. Humphreys was the kind of man Mrs. Smith testified he was, he certainly would never have deliberately deceived her, in order to procure her release—especially as the transaction deprived him of the income on one-half of the estate.    So if we accept all the testimony in the record as competent, it falls short of what would be required to justify a Court of equity in annulling and vacating a release made under such circumstances as we have referred to, or in granting the relief prayed for in this bill.

We have not overlooked the relations that existed between these parties.    They were such as to require us to carefully scrutinize the actions of Mr. Humphreys, but the arrangement made between them not only received the sanction of the Orphans' Court, which passed orders authorizing the administrator to transfer to himself the one certificate of stock and the other to Mrs. Smith, but it has no appearance of taking advantage of Mrs. Smith.    The evidence satisfies us that what was done was in accordance with the agreement made between Mr. Humphreys and Mr. and Mrs. Smith, and it might have been to the great advantage of Mrs. Smith to have the use of the one-half of the estate at once, especially if Mr. Humphreys had lived for a number of years, as he might have

done.　Although he did live for five and a half years after the release was executed, no objection appears to have been made during that time, and not until nearly seven years afterwards was this proceeding instituted—that, too, after Mr. Humphreys was dead and he could no longer explain the transaction or defend his conduct, if either was needed.　It may be said that the time did not arrive for action until after his death, but that could only be on the theory that he had made some definite agreement to leave the stock to her after his death. If that be so, then she was called upon to establish such an agreement as could be specifically enforced.　To say the least, Mrs. Smith's own testimony leaves the question in great doubt—whether the stock was to be left to her by assignment, by "will or something to that effect," or whether it was to be left to "the family" and not to her.　But regardless of those questions, we are satisfied that the evidence fails to establish the fact that Mr. Humphreys agreed as a consideration for the execution of the release, or permitting him to transfer to himself this certificate, that he would leave it to Mrs. Smith, and that the most that can be fairly deduced from the testimony is that he left her under the impression that he would so leave it, without in any way binding himself or his estate to such a disposition of the certificate or intending to do so.　So without discussing other questions that were raised, we will affirm the decree.

> *Decree affirmed, appellants to pay the*
> *costs.*