HARRIETTE THURSTON SMITH ET AL. *v.* WILLIAM H. MARTIN.

[No. 90, October Term, 1927.]

*Decided February 2nd, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Sloan, JJ.

*H. Stanley Hinrichs* and *William Stanley,* with whom were *Bright, Thompson & Hinrichs,* and *Stanley & Stanley,* on the brief, for the appellants.

*Joseph A. Wilmer* and *Cecil Connor,* for the appellee.

Pattison, J., delivered the opinion of the Court.

On the 25th day of June, 1923, the appellants, Harriette Thurston Smith and Williamson P. Smith, her husband, of St. Mary's County, Maryland, leased unto the appellee, William H. Martin, of Leesburg, Virginia, a vacant lot or parcel of land, at Scotland Beach, in St. Mary's County, fronting upon the Chesapeake Bay a distance of about sixty feet and running back therefrom a distance of about one hundred feet, for a term of years, commencing on the first day of January, 1923, and ending with the 30th day of December, 1938, with the right of renewal for an additional term of ten years, at the yearly rental of seventy-five dollars, payable on the first day of June in each and every year.

The property leased, which was a part of a tract of land containing eighty acres owned by Mrs. Smith, is described

in the lease as "all the * * * tract or parcel of real estate, being part of what is known as St. Michael's Manor, * * * also part of * * * the Richardson Place, to wit, that portion of a grove of pine woods bounded on the south by the northern line of the state road (leading from Leonardtown to Scotland Beach) and on the east by the Chesapeake Bay." Then follows a more specific description of the property leased, in which the metes and bounds thereof are given. And immediately after such description is the following clause: "Together with all rights, privileges, ways, water rights on said beach and bay, and all appurtenances thereunto belonging, with right of ingress and egress as to any part of said grove not included within the above boundaries for any purpose whatsoever."

By the terms of the lease the lessee was given the right to sublet the leased premises to any one, other than a person of the colored race or one "undesirable as to habits or occupation." He was also given the right, at the expiration of the term of his lease, or any renewal thereof, to "remove all buildings or other improvements placed upon the land," with "the right of ingress and egress for that purpose."

Under the lease, the lessee was to have immediate possession of the premises "with the right to erect a cottage or other buildings on the said premises, and a sanitary toilet at a point in the grove beyond the boundaries of the above premises, provided the same is made reasonably private and secluded. Also to sink a well on said leased premises." And the burden was imposed upon the lessee to protect the trees on the leased land from damage.

The lessors agreed "not to lease any part of the residue of said grove for any purpose other than the erection thereon of residential cottages" and "not to lease (any part thereof) to any person of the negro race," with the proviso that, "if this covenant is broken," the lessee "shall recover damages therefor, which damages in any event shall be not less than the stipulated annual rent of seventy-five dollars, which amount shall cease to be due and payable, but the period of said lease shall not be affected."

The lease, when executed, was recorded in the office of the clerk of the Circuit Court for St. Mary's County, and the lessee thereafter built upon the leased lot a cottage at a cost to him of about eighteen hundred dollars, and paid in advance the stipulated rent for each of the years 1923, 1924, 1925 and 1926.

In the fall of 1925 Mrs. Smith negotiated with Edward W. Mollohan for the sale to him of her eighty acres of land, and on the 7th day of December, 1925, an agreement of sale was executed by Mollohan as trustee and Mrs. Smith, in which the latter agreed to sell to the former, for the sum of ten thousand dollars, said land, "together with any and all improvements thereon, which improvements consist of a small dwelling located on a lot now leased to one W. H. Martin, which lot is of the size of about sixty feet by one hundred feet, more or less, and is located near the corner of the property of * * * Ridgell on the bay front, which lot is under lease between the undersigned owner and the said Martin, which lease has about seven years to run, and it is understood that this purchase includes all rights in said property, and ownership to said property, subject to the terms of said lease only."

Upon an examination of the lease on record in the office of the clerk of the Circuit Court for St. Mary's County, it was found by Mollohan that the term for which the property was leased to Martin did not expire at the end of about seven years, as stated in the contract of sale with Mrs. Smith, but that the term of the lease extended to the 30th day of December, 1938, with the right to the lessee to renew the lease for an additional term of ten years. At the same time Mollohan learned of the provisions in the lease conferring certain rights upon the lessee in respect to the lands of the appellants not included in those leased to him, which, as claimed by Mollohan, created a lien or cloud upon the title to the whole or entire tract of eighty acres, and, because of the facts so learned by him, he refused to comply with the terms of the contract of sale made by him with Mrs. Smith.

On April 2nd, 1926, Mr. and Mrs. Smith filed their bill

in this case, asking that the lease to William H. Martin from them, dated June 25th, 1923, be annulled and set aside on the ground that it was procured by the fraud and misrepresentations of the defendant and his agents. A demurrer filed to this bill was sustained and; on the 15th day of November, 1926, an amended bill was filed asking for the same relief upon the ground that the plaintiffs "were induced by the defendant and wife and * * * Percy Yeatman to sign and acknowledge the paper writing * * * purporting to be a lease," which, as stated by plaintiffs, was "fraudulent, vague and uncertain and without a proper consideration and it constitutes a cloud upon the title of the said Harriette Thurston Smith to at least eighty acres of land, and that the said William H. Martin is an attorney at law, and obtained the aforesaid pretended agreement from your complainants while one of them was suffering from a nervous break-down, by fraud, collusion and undue influence. Further, that the said pretended agreement, unless set aside and annulled by a court of equity, will prevent your orators from carrying out the contract of sale above mentioned or from otherwise disposing of the said property to any other purchaser except at a grossly inadequate price."

This bill was answered by the defendant Martin and evidence was taken upon the issues created by the bill and answer, and upon such evidence the learned chancellor below dismissed the bill. It is from that decree of the court that the appeal in this case has been taken.

The facts of this case, in substance, are that Mrs. Smith was the owner of one hundred and fifteen acres of uncleared or wooded land lying near Scotland Beach, in St. Mary's County, thirty-five acres of which were on the south side and eighty acres on the north side of the state road leading from Leonardtown to Scotland Beach. It is the land lying on the north side of that road and bordering on the Chesapeake Bay that is involved in these proceedings. About one-half acre of this land, lying immediately north of said state road and bordering upon the Chesapeake Bay, had been cleared of its undergrowth, while the undergrowth on that part of the

eighty acres lying to the north of it and separated from it by a road leading from the state road to the bay had not been cut down and removed, and, as stated by one of the witnesses, it was a dense and "impenetrable thicket." It was the one-half acre upon which the undergrowth had been cut and removed that was known by those in the neighborhood as "the grove."

Persons visiting Scotland Beach in automobiles would camp in this grove, for which a charge was made by Mrs. Smith and collected by Percy Yeatman, a friend and near neighbor of Mrs. Smith's, who was employed at Scotland Beach, and much of his time was expended working in and about the hotel.

Mr. Martin, who, as we have said, lived at Leesburg, Virginia, in June, 1923, with his wife and two children visited Scotland Beach. They were pleased with it as a summer resort, and he determined to buy a lot there, if he could, and erect a cottage thereon. He saw Mr. Ridgell, the proprietor of the hotel, and inquired of him whether he knew of any lots fronting on the bay that could be purchased. Ridgell said he knew of none. Martin had observed "the grove," and he asked Ridgell if he could not buy a lot there, and was told by him that the owner, Mrs. Smith, would not sell, but suggested that she might lease him a lot, and Ridgell advised Martin to see Mr. Yeatman, who, he said, was a near neighbor of Mrs. Smith, and have him find out whether she would sell or lease. Yeatman, when seen by Martin, said he did not think Mrs. Smith would sell, but he "thought she wanted to lease her bay front property." Martin then asked him to see Mrs. Smith and find out from her whether or not she would lease or sell him a lot. Yeatman saw Mrs. Smith and, on the 22nd day of June, reported to Martin that Mrs. Smith would not sell, but would lease him a lot, and suggested that he go see her. On the next day, June 23rd, Martin, with his wife and Mr. Yeatman, went to Mrs. Smith's home, about one and a half miles from the beach, where he was introduced to Mr. and Mrs. Smith.

Mrs. Smith, in speaking of their visit on this occasion, said

she had been told on the day before by Yeatman that there was a man at Scotland Beach, Mr. Martin, who wanted to lease a place for a shack or cottage in the grove. She asked him what kind of a man Mr. Martin was, and he said, "He is a Virginian and a gentleman and a man I think you would like to do business with." Martin told her that he wanted to lease a lot in the grove near the bay and asked for a ten-year lease. She objected and suggested a five-year lease and he said that he might not be able to get a cottage put up in that time, in which statement she said she agreed with him. She wanted one hundred dollars a year rent, but he was not willing to give more than seventy-five dollars, and so she agreed to lease to him the lot at an annual rental of seventy-five dollars, to be paid June 1st of every year. She was then asked, "What if any discussion took place as to any other terms or conditions of the lease?" She said, "None," and when asked, "What, if anything, did Mr. Yeatman say about the proposed lease?" she replied, "He said nothing at that time." They were at her house only about one-half hour and she never saw Mr. Martin again until the following September.

As stated by Mrs. Smith, the lease was brought to her on Wednesday, the 27th day of June, by Mr. Yeatman. He came at her lunch hour. She was asked what Yeatman said about the lease, and she said "He did not say anything. He just simply handed me the lease. Q. What did you do? A. I looked at it and regret very much that I did not read it carefully. I simply casually glanced at it, glanced over it, and missed seeing a very important part of it in regard to the duration of the lease. I had leased to Mr. Martin for ten years and only ten. Q. What did you say to Mr. Yeatman when you looked at this lease? A. I did not discover that there was anything wrong with that part of it at all, but when Mr. Martin was with us he said that any buildings he would erect on the place would be ours after the lease expired. In glancing over this paper I saw that that was not as he had said, that he had the right to remove these buildings. I said to Mr. Yeatman, 'This is strange. I

understood Mr. Martin to say that the buildings would be ours.' Mr. Yeatman's remark was, 'Well, don't worry over that, for at the end of ten years they will surely all be in the bay.' Q. Why? A. Because they were all put very near to the water's edge. Q. What if anything, did Mr. Yeatman tell you with respect to the location of the land which Mr. Martin wanted to lease? A. He said he wanted it near a clump of trees, and very near the water, a place that we had never thought of allowing anybody to get, for sentimental reasons. It was a place that we thought a great deal of, that particular spot, but he said that Mr. Martin would want it as close to the water as possible. * * * Q. What if any examination did you make of the lease to determine how long the property was to be leased to Mr. Martin? A. I did not examine it at all, but Mr. Martin in his verbal agreement with me said nothing about releasing, and in this lease there was mention of releasing, but I thought that was optional, and thought that, if at the end of the ten years I did not want Mr. Martin, all I had to do was to say so. Q. Did you make an examination of the lease to determine for how many years it was to run? A. Indeed I did not. I thought, of course, Mr. Martin had embodied in the lease his verbal agreement with me for ten years, and I did not notice at all that he had changed it. Q. What if anything did Mr. Yeatman say in respect to his recommending that you sign or do not sign the lease? A. He thought it was all right for me to sign. Q. How do you know he thought so? A. I said, 'I wonder if this is all right?' and he said, ' I think so.' Q. What if anything did Mr. Yeatman say about Mr. Martin having asked him to bring the lease to you? A. He only said Mr. Martin had asked him to bring the lease. He did not say anything more than that. Q. What did you do with the lease after you had signed it? A. After I signed it, Mr. Yeatman took it to return it to Mr. Martin." Mrs. Smith further stated that, in the afternoon of that day, Yeatman, with Mrs. Martin, came to her home and she, with her husband, Mr. Smith, went with them

to Airedale, about three and one-half miles away and, there acknowledged the lease before Hugh Smith, a notary public, a relative of her husband, and, though the lease was dated June 25th, 1923, it was not, as a matter of fact, executed and acknowledged until Wednesday, June 27th.

Mr. Martin testified that, after being told by Yeatman, on the 22nd day of June, that Mrs. Smith would not sell, but would lease a lot to him at an annual rental of seventy-five dollars, but not for fifty dollars, the amount that Martin had said he would pay as rent therefor, he drew up a tentative lease for a lot for a term of years ending on December 30th, 1933, with a right to buy the same at any time during the existence of the lease for the sum of five hundred dollars. This he did, as he said, not knowing how "fixed Mrs. Smith was about her intention not to sell." If he could, he much preferred to buy. On the next day, he, with Yeatman, his wife, and two children, went to the home of Mr. and Mrs. Smith, it being the first time that he had seen either of them. There was nothing in Mr. Smith's appearance or action to indicate to him that he was ill or suffering from nervous breakdown, nor did he know that he was in that condition. They knew the purpose of his visit and he handed to Mrs. Smith the lease that he had drawn. Mrs. Smith, in glancing over the lease, observed the option to buy and she, not wishing to sell, refused to sign. He then told her that it was impossible for him to lease this property for a period less than ten or fifteen years and told her that in no event would he lease it without an option of renewal. Mrs. Smith made no objection to the period of the lease, and agreed to the fifteen year term as well as the option for a renewal. In discussing the matter with her, he made a memorandum of the things discussed and agreed upon and the memorandum so made embodied all the terms that were verbally agreed on at that time, and from it the lease was afterwards drawn. He further stated "we were not present at Mrs. Smith's home * * * over a half hour. We soon concluded the terms of this lease, * * * I have no recollection of Mr. Yeatman

making any suggestions to Mr. and Mrs. Smith and, before leaving, I said to Mrs. Smith that I was not familiar with the Maryland law"; that he hardly knew whether he could write the form of the certificate that was required, and told her to get a lawyer to draw the lease according to the terms agreed upon and send it to him and he would execute it. She said: "Mr. Martin, it will inconvenience me very much to go to Leonardtown and Mr. Hinrichs, a friend of mine, a lawyer, is not so well, and I can't bother him with it." And further said: "You are a lawyer, why don't you write it," and he said, "Mrs. Smith, if it is any accommodation, I will write it. If you will trust me, I will trust you." He returned to the beach and wrote the lease upon a pencil tablet, on June 24th, but, as it was Sunday, he dated it June 25th, though he dated the certificate thereto June 27th. This was because he had been told on June 23rd by Mrs. Smith that she wanted to submit the lease to Hugh Smith, and he would not be back home until the 27th, and, on Sunday afternoon of June 24th, he left for Leesburg, where he had to be in attendance at court, and did not return until June 27th, and was not present at the execution and acknowledgment of the lease. When it was brought back to him on the 27th, "I gave Mrs. Smith a check ($75) for her rent (for the year 1923) and at the same time I gave Mr. Yeatman a check for $35 for his services in the matter. * * * I don't think Mr. Yeatman expected that money." He promised to pay Mr. Yeatman, but the amount had not been stated. "I did not know anything about Mr. Yeatman's connection with Mrs. Smith. She states in her bill that he was her agent. If he was, I knew nothing about it. I thought he was a neighbor and a friend, and he was a perfect stranger to me." He did not know that Yeatman ever exercised any rights over the grove until September following the execution of the lease, when he learned that he collected charges from the campers. The grove, as he understood it, triangular in shape, was not over a quarter to one-half acre in size, and was bounded by the state road

on the south and the beach on the east, and a road leading from the state road to the beach on the north. All to the north of that road, as he said, was "an impenetrable thicket, grown up with poison ivy vines, low bushes and undergrowth, and was not used, so far as I knew, for any purpose whatsoever. In drawing this lease, I used the word 'grove' and my intent in using that word 'grove' in that lease" was confined to "that triangular space." The land to the north of it he said was known to him as Mrs. Smith's "woods" and he regarded that entirely separate and distinct from Mrs. Smith's "grove" and within the meaning of the lease was not included within those lands in respect to which certain rights were conferred upon him. The right given to him to erect a toilet outside of the bounds of the leased premises was, as he construed the lease, confined to the grove, and it was so intended by him in drawing the lease. It was, however, thought by him and his wife that the toilet would be unsightly if located within the grove, so with the consent of Mrs. Smith it was placed beyond the road on the north, where it was concealed from view by bushes and by trellis work erected by him.

When asked what his understanding was of the clause in the lease "together with all rights, privileges, ways, water rights, on said beach and bay and all appurtenances thereunto belonging, with the right of ingress and egress as to any part of said grove, not included within the above boundaries for any purpose whatsoever," he answered saying, "My purpose in leasing this lot on the beach was for bathing purposes, and that clause giving me all rights, privileges, and so forth, and all appurtenances thereunto belonging, had reference to the riparian right as to my front line, the distance * * * along the bay shore. It did not mean, it was not intended to mean, that I had any rights whatever in the remaining bay shore line of Mrs. Smith outside of the leased lot; nor have I ever exercised any rights in the grove beyond the leased premises, or in the bay shore beyond the leased bay shore front, * * * nor have I ever claimed any such right. * * * The clause as

to the right of ingress and egress was simply a nice way of expressing the right of going to and from the toilet which I had a right to put in the grove, and I never exercised any rights in the grove beyond that right of ingress and egress to this toilet. The grove is in the possession, or has been in the possession, of Mrs. Smith; she has exercised her own control and authority over it, and I have never attempted and do not want any interest in any part of the grove except as to the leased lot." Mr. Martin, when asked "Have you anything further to state to the court as to your attitude towards Mrs. Smith, * * * which you think is germane and pertinent to this issue?" said "Well, that is rather a broad question, but my attitude towards Mrs. Smith has been—that is, I have tried to be a friend with Mrs. Smith in all my relations with her. I am not willing to see, even now, Mrs. Smith suffer any loss, and I am willing to offer to Mrs. Smith the sum of eleven thousand dollars for her property and take over the Mollohan contract at any time that Mollohan refuses to do so; and I am ready and willing and now produce and offer, and file with this record, a cashier's check of one thousand dollars, as evidence of my good faith." This check was endorsed by him and filed with the clerk of the Circuit Court for St. Mary's County.

It is claimed by the appellants that it is shown by the evidence, first, that the relation of attorney and client existed between Mr. Martin and Mrs. Smith, and second, that the relation of principal and agent existed between Mrs. Smith and Mr. Yeatman, and that Martin, knowing of that relation, wrongfully procured Yeatman to induce Mrs. Smith to execute the lease, and, because of the existence of such relations, and the conduct of Martin in procuring the services of Yeatman, there was imposed upon the appellee the duty of proving the *bona fides* and fairness of the transaction, resulting in the execution of the lease by the appellants. The evidence in this case fails to disclose that the relation of attorney and client existed between Mr. Martin and Mrs. Smith. Mr. Martin was a stranger to her. It is true he was a lawyer, but he had at no time been her attorney, nor was he acting

as her attorney in this transaction. She was unable to say whether he or she suggested that he should prepare the lease, though he testified that he suggested to her that she get her attorney to prepare it and send it to him and he would execute it, telling her he was not familiar with the Maryland law and hardly felt capable of preparing the lease. And it was only to oblige and accommodate her that he agreed to prepare it, saying "If you will trust me, I will trust you." This expression did, in no way, create the confidential relations of attorney and client. It meant only that if she were willing for him to draw it, after he had expressed doubt as to his ability to prepare it, he was willing to attempt it. The fact that the defendant, a party to a contract, was an attorney, and that he was willing to prepare the lease without compensation, was not enough to establish the relation of attorney and client. *Stout v. Smith*, 98 N. Y. 25. Nor does the evidence show the existence of any confidential relation between Mrs. Smith and Yeatman arising out of the relation of principal and agent. Yeatman was shown to have been a friend of the appellants, but, so far as the record discloses, he had no business relation with them beyond the fact that he would collect for Mrs. Smith the charges for camping in the grove. This fact alone did not establish a confidential relation between them that would enable Yeatman to control or improperly influence her in the execution of the lease, but if it did, there is no evidence, whatever, that he, in any way whatever, attempted to exercise such control and influence over her, or that he said or did anything in betrayal of the confidence reposed in him by her. By her own testimony Yeatman did not know the contents of the lease, for she said that Yeatman, like herself, thought that the term of the lease was for ten years only, and this is the provision of which she most complains. The burden, therefore, was upon the plaintiffs to prove the allegations of their bill, which they have, we think, utterly failed to do.

As to the conduct of Mr. Martin, we fail to find anything to arouse suspicion of wrongdoing on his part. The apprehensions of the appellant, that certain rights conferred upon

the appellee have the effect of creating a cloud upon the title to the whole eighty acres, is, in our opinion, wholly unfounded. The provisions in the lease which give to the lessee "all rights, privileges, ways, water rights on said beach and bay and all appurtenances thereunto belonging" means only the rights, privileges, etc., belonging to the leased premises, and the "right of ingress and egress as to any part of said grove, not included within the above boundaries, for any purpose whatsoever," extended no further than the grove, which, by the evidence, is shown to be that part of said eighty acres which, at that time, was cleared of its undergrowth and of which there is not more than one half acre. And, as stated by the appellee, the right of ingress and egress therefrom was confined solely to the purpose of going to and from the toilet, which by the lease he was permitted to erect in the grove beyond the boundaries of the leased premises.

The appellants' chief claim, as we have said, is that the term mentioned in the lease, with the right of renewal for an additional period of time, is greater than the term agreed upon between the parties to the lease. The term, as she claims, was to be for only ten years and that, in extending the time of the lease, she was deceived and defrauded by the lessee, who wrote the lease and inserted in it the longer time not agreed upon by them.

Mrs. Smith is shown to be an intelligent, educated woman. The lease was given to her in person and she had full opportunity to read it. She says she did not read it, but glanced over it. This was not the first lease that was presented to her by the appellee. The first she read, and discovered that there was in it a clause enabling the lessee to purchase the leased property at any time, during the existence of the lease. This provision of the lease was readily discovered by her and she refused to sign the lease. When the second lease, the one in question, was presented to her by Yeatman, she glanced over it, she says, and found two objections. The first the right of renewal and, second, the right to remove the buildings and improvements at the expiration of the term of the lease. As to the first of these objections, it is said in the

lease, "on and after December 30, 1938," fifteen years from the date of the lease, the lessee, "shall have the option to renew the same for ten years * * * whereupon a new lease shall be executed for the additional period of ten years from and after December 30, 1938."

From her examination of the lease she learned of the provision which gave to the lessee the right of renewal, but she did not observe that the term of the lease was for a period longer than ten years. It is difficult to understand how she learned that the right of renewal was given to the lessee, and yet failed to discover the length of the term, as stated in the lease, when these provisions were so closely connected. In addition to this, there are statements found in letters from Martin to her, prior to the execution of her contract with Mollahan on the 7th day of December, 1925, from which we are inclined to believe that she knew that the term of the lease was for a longer period than ten years. In a letter by him dated Sept. 5th, 1923, he wrote her: "I am much worried. When I recorded your lease to me, on Saturday last I found a deed of trust (it really was a mortgage) on this land. I wish you had told me of this. What good to me of a fifteen year lease with renewal, if creditor forces the lien." And again, in a letter of February 19th, 1925, he wrote her: "I wish you would be willing to sell me my lot. A long lease like mine is almost a sale." But if she did not know, at the time of the execution of the lease, the extent of the term for which it was to run, she, being able to read, and having a full opportunity to read the lease, she should have read it and have ascertained its contents. As was said by Judge Boyd, in *Smith v. Humphreys,* 104 Md. 290, "Any person who comes in a court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the court because he did not read a paper involved in the controversy, and was thereby imposed on, should be required to establish a very clear case before receiving the assistance of the court in getting rid of such document. It is getting too common to have parties ask courts to do what they could have done themselves, if they had exercised ordi-

nary prudence, or, to state it in another way, to ask courts to undo what they have done by reason of their own negligence or carelessness."

The appellants in this case have absolutely failed to prove the charges against the appellee alleged in their bill. The payment by him to Yeatman of thirty-five dollars for his services may be regarded as somewhat liberal, but as no specific amount had been promised him in advance of his services rendered, and as it was not known to him what he would be paid therefor until after such services were rendered, the payment to him of thirty-five dollars can only be attributed to the liberality of Mr. Martin.

The decree of the learned chancellor below dismissing the bill will be affirmed.

*Decree affirmed, with costs.*