# CASSELL *v.* PFAIFER

[No. 279, September Term, 1965.]

448

*Decided July 19, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*David Freishtat* for appellant.

*William O. Goldstein,* with whom was *Carl E. Weingarten* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Truth is always strange.[1] It may sometimes be improbable.[2] These ancient cliches are singularly appropriate to this episode in the lives of the appellant, Junia Cassell (Cassell) and Susan Pfaifer, the appellee (Susan). They met during the Christmas holidays in 1955 and began to keep company in the spring of 1956. She was 35 and widowed. He was 33, married, but separated from his wife.[3] He was a clerk in a neighborhood food market. She kept house for her uncle, John Kruk (sometimes spelled Crook), with whom she had lived since childhood. Neither had advanced beyond grade school. Early in the summer of 1956, while in a hospital convalescing from abdominal surgery, he was visited by Susan and her Uncle John. Because Cassell lived alone they urged him to stay at Uncle John's house, on York Street, until he was fully recovered. Uncle John said, "You no can take care of yourself, you come and stay until you get well." For a while he was a guest but when his in-

---

1. George Noel Gordon, Lord Byron, *Don Juan,* Canto XIV, Stanza 101.
2. Nicholas Boileau-Despréaux, *L'Art Poétique,* III, L. 48.
3. Cassell was divorced from his wife a few years later.

surance benefits became available he began to pay $20 per week for his room and board. Soon after he moved in Susan became his mistress.

In 1945 Uncle John had conveyed the York Street property to Susan "reserving * * * a life estate unto himself with the full and absolute power to mortgage, sell, convey * * * the entire estate." Whether Susan was aware of her remainder interest when she met Cassell is not revealed by the record. Nor is there any indication that Cassell, at that time, knew of it.

Cassell found the amenities of the household to his liking and they (including Susan's daughter, Jean) settled into a pleasant, harmonious routine. They "ate together, * * * went places together, * * * went out and had fun together, * * * went together on picnics [and vacations]." Cassell bought a washing machine, a studio couch, a hot water heater, a steam iron and a typewriter, all of which were put to use in the house. Susan wore a ring which looked like a wedding band and some people thought they were married. He did odd jobs around the house and, on at least one occasion, provided the necessary materials. As he put it, he "usually done what a man usually does around the house as a married man." He felt they "were all living there as one happy family."

In late 1959 a builder demolished the structure next door and, in the process, damaged Uncle John's house. He had counsel file suit against the builder and in April 1960 a settlement was negotiated. Counsel deducted $600 for services and made his check for the balance ($1,700) payable to Uncle John and Susan. This check was endorsed and left (neither cashed nor deposited) with Paradise Building Association, Inc. (Paradise).

Uncle John, Susan and Cassell debated whether to repair the house or accept the builder's offer of $4,000 and buy another one. Cassell thought the house was not worth repairing. Susan said she couldn't "afford to buy a house." After much talk Cassell said "Uncle John loves me like a son and I like him as a father. As [we are] all one family and we are going to get married, what's wrong with us all going in together?" No one demurred so Susan and Cassell went house hunting. She learned from her younger sister that a house on Doris Avenue was for

sale. They looked at it, liked it and, later, took Uncle John to see it. Further details were left to Cassell. He talked to the people at Paradise and from them he learned that Paradise would finance the purchase only if he (Cassell) joined in the execution of the mortgage. It seems that Uncle John and Susan were not acceptable because he was retired, she was a widow, and neither had sufficient means or income. Cassell said he relayed all this information to Uncle John and Susan.

Early in May Uncle John disposed of the house and Cassell and Susan signed the contract for the Doris Avenue property. As earlier noted, the check for $1,700 had been left with Paradise. Cassell went to the Paradise office, added his name as an endorser, deposited $1,200 and received the check of Paradise for $500, which he and Susan took with them when they went to sign the contract for the Doris Avenue property. The owners presented them with a contract on a printed form which was not fully completed. Cassell wrote in his name as buyer and made other additions concerning certain appurtenances. He signed the contract and then passed it to Susan. Oddly enough she signed Uncle John's name. Their signatures were witnessed by her daughter, Jean and a boy friend. The purchase price was $10,200, $500 of which the sellers' receipt stated was "Received from Junia H. Cassell." Cassell had written in also a provision calling for settlement in 30 days, "if possible."

By arrangement with the owners of the Doris Avenue house, Cassell, before they moved in, made a number of repairs and improvements. Early in July he went to the office of Paradise and signed the application for the loan he had negotiated earlier. The application indicates that "title [is] to be taken in the names of Sue Pfaifer, John Kruk and Junia H. Cassell." Item 2, under the heading "Personal History," calls for the full name of the applicant's wife, "if married." Cassell inserted "Sue Pfaifer (wife to be)."

During the forenoon of 7 July 1960 Uncle John and Susan (Cassell was not present) went to the office of The Title Guarantee Company for the settlement of the York Street house. Uncle John signed the deed and the memorandum of settlement and received the title company's check, to his order, for $3,-741.94. In the afternoon of the same day Cassell, Susan and

452

Uncle John went to the office of I. William Schimmel, Esq., the attorney for Paradise, for the settlement of the Doris Avenue house. The memorandum of settlement shows that the amount of the loan was $5,200, to which was added the amount Paradise was holding in escrow [4] ($1,400). Uncle John handed over the $3,741.94 check he had received at the York Street settlement which was more than was needed so Mr. Schimmel gave Uncle John his check for the excess ($162.40). The sellers signed and delivered a deed which created a joint tenancy in Susan, Uncle John and Cassell. The mortgage, requiring monthly payments of $43.89 principal and interest, and $31.46 expenses, was then signed by all three.

Uncle John failed rapidly after the move to Doris Avenue. He had been something of an invalid since 1957. Cassell had taken him to and from the hospital a number of times and frequently he assisted Susan in performing the nursing services the old man required. One of the symptoms of his ailment was an incontinence of both bladder and bowel. Cassell, at times, had to assist in attaching the urinal device he had to wear. He got along well with Uncle John, who "was like a father to him." Cassell felt he "was like a son to " Uncle John. He was with him the night he died (28 October 1961).

Uncle John's death brought to an end any financial assistance he may have provided. Otherwise things went on pretty much as before. In the spring of 1963 they bought an awning for the house. The application for the loan ($428), which made their purchase possible, was signed by Cassell and "Susan Pfaifer Cassell." Then she signed the contract of sale "Sue Cassell."

On a number of occasions Cassell had asked Susan to marry him but, for reasons not in the record, "she kept turning * * * [him] down." Their *liaison amoureuse,* which she seems to have preferred, began to founder in the fall of 1963. He proposed marriage for the last time in November and when she refused he told her he was "going to wait until the first of the year" and that if, by then, she hadn't made "up * * * [her] mind

---

4. The avails of the claim for damages ($1,700) less the $500 used for the down payment, plus the $200 down payment made by the buyer of the York Street property.

to marry * * * [him], * * * [he] was getting out." He left on 7 March 1964 and on 4 September 1964 married Florence Bender Cassell.

The ensuing litigation was begun by the filing, on 2 September 1964, of Cassell's petition for the sale, in lieu of partition, of the Doris Avenue house. On 19 September Susan filed a bill of complaint to compel Cassell to convey his interest to her and to restrain him from transferring it. Susan's bill of complaint alleges neither the existence of a confidential relationship nor facts from which such a relationship might arise. There is no allegation of fraud nor the recital of any facts from which fraud might be inferred. Her bill of complaint is remarkable in other respects. She alleges the acquisition of the Doris Avenue house as a joint tenant with Uncle John (excluding Cassell). No mention is made of Cassell's liability on the mortgage. She alleges ownership of the York Street property by herself and Uncle John as "joint tenants." And, despite her special knowledge to the contrary, Cassell is referred to, throughout the bill of complaint, as "she," "her" and "herself."

On 22 December the cases were "consolidated for purposes of [the] trial," which took place on 4, 6 and 7 May 1965. Judge Prendergast, in deciding in favor of Susan, held that a confidential relationship existed between her and Cassell. With that holding we are unable to agree.

It is true, as has been pointed out in Susan's brief, that the decision of the trial court on the facts must be respected unless clearly erroneous. It is also true that before we can say that the lower court's decision is clearly erroneous the evidence must be reviewed in a light most favorable to Susan. If, viewed in that light, there is *substantial* evidence to support the factual conclusion, then we should accept that conclusion. But if there is no substantial evidence, then the conclusion may be disregarded as arbitrary. *Space Aero v. Darling*, 238 Md. 93, 106, 208 A. 2d 74 (1965) ; *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 129, 85 A. 2d 759 (1952). Susan cites many other like decisions of this Court and of other courts, but in one way or another, they all say the same thing. The trial court's conclusions of law based upon the facts, however, are reviewable by this Court. *Space Aero, supra.*

We are not here concerned, we think, with a relationship which is presumed, by its very nature, to be confidential. *Zimmerman v. Hull*, 155 Md. 230, 240, 141 Atl. 531 (1928). The relationship, if it exists, must be proved as a fact. *Tracey v. Tracey*, 160 Md. 306, 153 Atl. 80 (1931). In our judgment the evidence offered, in the case at bar, to prove the fact lacks that degree of substantiality which would require us to affirm the trial court.

There can be no doubt that Uncle John, Susan and Cassell, by their cooperative effort, accomplished something which would have been difficult, if not impossible, of accomplishment without any one of them. Uncle John had the necessary cash. Cassell supplied the credit and Susan undertook the management of the household and the care of Uncle John.

Judge Prendergast gave his reasons for finding that a confidential relationship (between Susan and Cassell) existed and we shall discuss them in the order in which he stated them.

"While Mr. Cassell [he said in his opinion] was fully aware of the fact that * * * [Susan and Uncle John] had been represented by Mr. Kimmelman [in the damage suit] he [Cassell] made no effort to have Mr. Kimmelman come out and attend the settlement on this Doris Avenue property. Mr. Kimmelman simply was not consulted." Uncle John had employed Mr. Kimmelman to file the suit for damages and when the case was settled he, with Susan's approval, directed Mr. Kimmelman to negotiate the sale of the York Street property. Mr. Kimmelman did so and prepared the contract of sale which was signed by Uncle John and Susan. Nowhere in the evidence does it appear that Cassell procured the services of Mr. Kimmelman for Uncle John or that he ever prevented or discouraged Uncle John (or Susan) from consulting him thereafter. Neither Uncle John nor Susan consulted Mr. Kimmelman in connection with the settlement of the York Street house. In fact, Uncle John went (with Susan) to the title company's office (the Doris Avenue property was settled later the same day) and concluded the transaction without the advice or assistance of anyone. Although Mr. Schimmel had represented Cassell in his divorce case Cassell did not know he was the attorney for Paradise, to which he had been referred by his insurance agent. While cross-ex-

amining Cassell, Mr. Kimmelman twitted him about this. "Why didn't you * * * ask me to represent * * * [Susan and Uncle John] at that time [the Doris Avenue settlement] and why * * * did you go to your own attorney, Mr. Schimmel?" Cassell's reply was that he knew Mr. Schimmel and that he "never did charge an outrageous fee." It might be noted, also, that neither Susan nor Uncle John consulted any attorney regularly and that Mr. Kimmelman was employed for a specific purpose. Nevertheless, he was available for consultation and accessible to either of them. Certainly Cassell was not obliged, in the circumstances, to communicate with Mr. Kimmelman. In *Taylor v. Pivec,* 149 Md. 526, 532, 131 Atl. 757 (1926), Chief Judge Bond, for the Court, said:

> "'The appellant argues that donees are regularly required, in order to sustain a gift of so large a portion of the donor's property, to show that the donor had the protection of the independent advice of a third person. We do not agree that such independent advice is requisite to the validity of all gifts, even of all gifts to donees in a confidential relation."

The court's finding that Cassell paid nothing except $30 per week board after they moved into the Doris Avenue property overlooks completely much uncontradicted testimony. He rejected Cassell's testimony of mortgage and utility payments made by him and other contributions made to the household, saying "if I were to believe him, I would have to rule that every penny he ever earned was used to support this household. I simply reject that." Cassell's testimony that his outside employment in the refrigeration business produced an additional $75 per month is undisputed. Undisputed also is the fact that most of the proceeds ($1,200) of the sale of his land in Glen Burnie was applied to household expenses of one kind or another. Moreover, it will be observed, Susan, both in her bill and her direct testimony, steadfastly maintained that Cassell contributed nothing to repairs or maintenance. On cross-examination, however, she was obliged to admit that he had made substantial contributions.

The court said he had no doubt that Uncle John, "at least in

1960," was seriously ill. He was satisfied that "he was physically incapacitated and *probably* not in a position to take an active role in these real estate transactions." (Emphasis supplied.) We do not find in the record any testimony which supports such a conclusion. There is no doubt Uncle John was beset by the infirmities of age but the evidence is clear that he was able to get around and we find no suggestion that he was in any way lacking in mental capacity. It will be remembered that the settlement of the damage suit, the disposal of the York Street house and the purchase of the Doris Avenue house all took place in the first half of 1960. There is not the slightest indication that Uncle John was not fully aware of what was taking place or that he did not make his own decisions. There was no showing that he was subject to the domination or control of Susan or of Cassell or of Susan and Cassell acting in concert. Indeed, it is very likely the project had the enthusiastic support of Uncle John. After all he was merely exchanging the York Street house for the larger and more comfortable house on Doris Avenue. His net equity had diminished somewhat but he had insured the payment of the mortgage by making Cassell (the man who wanted to marry his niece) a joint tenant.

The court found that "there is no doubt whatever these two people were on the most friendly and cordial terms. * * * [Susan], who has a limited education and is not astute in business, trusted and confided in Cassell at all times." We agree that Cassell and Susan were "on the most friendly and cordial terms." There is also no doubt that they lived in the atmosphere of intimacy and harmony that should exist in close family life but, as we said in *Taylor, Adm. v. Pivec, supra,* at 531-32, a confidential relationship "cannot be made of that mere intimacy and harmony. There must be something more, and it has not been shown to exist in this case."

Susan, it is true, had a limited education, but so also did Cassell. Indeed, the education and business experience of Susan, Cassell and Uncle John were about the same. Other than her oft-repeated statement that she had confidence in him, there is no evidence that either Susan or Uncle John ever relied upon the advice or judgment of Cassell. One need only recall that she steadfastly refused his many proposals of marriage to realize

that Susan was far from being under Cassell's domination and control.

Another aspect of the case which the court seems to have overlooked is the fact that Uncle John was the real owner of the York Street house. All he had to do to defeat Susan's remainder interest was to sell, which, of course, he did. The contract of sale prepared by Mr. Kimmelman named Susan as one of the sellers and she actually signed the contract. It is clear, however, that only Uncle John's signature was needed. The title company required only his signature on the deed and the settlement check was made to him alone. The proceeds of sale were his to dispose of as he saw fit. Neither Susan nor Cassell had any interest in or claim to any part thereof.

Susan insists that Cassell's role in the purchase of the Doris Avenue property was merely that of "co-signer." She thought the house "would be in my name and his [Uncle John's] name and he [Cassell] would be only a co-signer." On cross-examination, however, she admitted Cassell explained to her that his name would be on the deed "because he was responsible for the mortgage if we didn't pay it." All things considered, we do not see how the evidence could support a finding that Cassell was willing to incur a personal liability of $5,200 without having some equity in the property. He testified, without objection, that Uncle John wanted it that way and that he merely put into effect what they had all agreed upon. Indeed, it seems to us a perfectly natural thing, in the circumstances, for them to want to do. Uncle John looked upon Cassell both as a son and as the future husband of his niece. In any event, Cassell's participation and cooperation were necessary and, as a result thereof, Susan was *elevated* to the status of a *joint tenant* with a vested interest.

The trial judge expressed the belief that *Wenger, Adm. v. Rosinsky,* 232 Md. 43, 192 A. 2d 82 (1963), is controlling. We take a different view. In *Wenger* we had before us a much different situation. Sergeant Kurtz was retired from the Marine Corps in 1945. His disability, which persisted until his death, was caused by malaria contracted when he was stationed in Haiti. When he became a boarder in Mrs. Rosinsky's house, in March 1960, he was 61 years of age, he had difficulty in walk-

ing, he was stooped and he had to use a cane. Between May and October 1960, when he died, he had transferred to Mrs. Rosinsky virtually all of his savings (in excess of $20,000). Judge Marbury, for the Court, said:

> "Applying these basic rules to the instant case we find, contrary to the conclusion of the chancellor, that such a confidential relationship did exist between Sergeant Kurtz and Mrs. Rosinsky. Almost from the outset of the relationship as boarder and landlady, he began to repose great trust and confidence in her, as she admitted in her testimony. She accompanied him on numerous trips to banking institutions and appeared to do the talking for him in his financial transactions. He relied on her to call a doctor of her choice during his illnesses and to contact two lawyers of her selection for the purpose of preparing his will. He gave her access to his safe deposit box and opened a joint savings account with her, using only his money. All these acts indicate a strong reliance on her judgment and integrity while he was concededly in poor health and unable to transact his own business without assistance. At no time did he have advice of counsel or independent advice from any other source. This was far beyond a normal, business relationship between a boarder and his landlady." *Id.* at 48-49.

In the case at bar it has not been suggested that Uncle John, who was the only one who had anything, was stripped of his assets or that he was at all unhappy or dissatisfied. Indeed, there is every indication that he was quite content. He had a one-third interest in a larger, more comfortable house; his niece had a one-third interest; her fiance (so he thought) had the remaining third. Upon his death they would be joint owners. They would make the payments and look after him for all the time that was left. That he fully realized the benefits he anticipated will not be denied. Since Susan had nothing, it cannot be said that Cassell induced her to part with anything of value. We do not think *Wenger* is controlling.

The burden of proof rests heavily on one challenging the ac-

curacy of an instrument of title to land. If this were not so, the reliance which the public necessarily puts upon land title instruments would be seriously disturbed. *Siemiesz v. Amend,* 237 Md. 438, 440, 206 A. 2d 723 (1965), and the cases therein cited. In *Smith v. Humphreys,* 104 Md. 285, 290-91, 65 Atl. 57 (1906), Judge Boyd, for the Court, said:

> "Any person who comes into a Court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the Court because he did not read a paper involved in the controversy, and was thereby imposed on, should be required to establish a very clear case before receiving the assistance of the Court in getting rid of the document. It is getting to be too common to have parties ask Courts to do what they could have done themselves, if they had exercised ordinary prudence, or, to state it in another way, to ask Courts to undo what they have done by reason of their own negligence or carelessness."

The Doris Avenue settlement was conducted by Mr. Schimmel, the attorney for Paradise. He testified that the deed and the mortgage which he had prepared were "on the settlement table and the opportunity was afforded everybody to read * * * [them] if they wished to do so." Moreover, it cannot be supposed that Mr. Schimmel would not have answered willingly and correctly any questions that might have been put to him by any of the parties present. In the light of Susan's claim that it was her understanding that the title was to be in the joint names of herself and Uncle John and that Cassell was to execute the mortgage as a "co-signer," one would expect her to exhibit at least some interest in the language of the deed and the mortgage as well. The fact that she knew that the contract of sale was in Cassell's name and that she had signed Uncle John's name just below Cassell's signature should have aroused her interest in the grantees named in the deed, to say nothing of the fact that all three names appeared on the settlement sheet.

In our opinion the evidence is not nearly sufficient for the

creation of a confidential relationship which would put upon Cassell the burden of showing that the transaction was fair, proper and reasonable. *Vogt v. Vogt,* 241 Md. 82, 215 A. 2d 741 (1966). Moreover, Susan has failed to meet the heavy burden placed on one challenging the accuracy of muniments of title to land. *Siemiesz v. Amend, supra.* Since the decision of the Chancellor is not supported by substantial evidence and is therefore clearly erroneous (Maryland Rule 886), the order of 28 May 1965 dismissing Cassell's bill for a sale in lieu of partition will be reversed and the case will be remanded for further proceedings, and the decree of 28 May 1965 ordering Cassell to convey his one-half interest to Susan will be reversed. The costs will be divided equally between the parties.

> *Order of 28 May 1965 ordering appellant to convey his one-half interest to Pfaifer reversed. Order of 28 May 1965 dismissing appellant's bill for a sale in lieu of partition reversed.*
>
> *Case remanded for further proceedings consistent with the views expressed in this opinion.*
>
> *Costs to be paid one-half by appellant and one-half by appellee.*