792 A.2d 288

**J.L. MATTHEWS, INC.**

v.

**MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION.**

**No. 65, Sept.Term, 2001.**

Court of Appeals of Maryland.

March 5, 2002.

72

Thomas H. Haller (Gibbs & Haller, on brief), Lanham, for petitioner.

Michele M. Rosenfeld, Associate Gen. Counsel (Adrian R. Gardner, Gen. Counsel, on brief), Silver Spring, for respondent.

Thurman W. Zollicoffer, Jr., City Sol., Baltimore, Edward J. Gilliss, County Atty., Towson, on brief of Amici Curiae Mayor and city Council of City of Baltimore, Baltimore County, Caroline County, County Com'rs of Charles, Hartford, and Montgomery Counties, and County Com'rs of Washington County, amici curiae for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

On 15 March 2000, the Maryland–National Capital Park and Planning Commission ("the Commission"), Respondent, filed a complaint for condemnation in the Circuit Court for Montgomery County seeking to acquire fee simple title to a 29,238 square foot parcel of land located in the City of Takoma Park ("the Property"). At the time of initiation of the condemnation action, the Property was owned by J.L. Matthews, Inc., Petitioner, which recently had obtained the requisite approvals and permits from Montgomery County to develop eight townhouses on the Property. After filing the complaint for condemnation, Respondent filed a motion for a temporary restraining order, and later a motion for a preliminary injunction, to prevent Petitioner "from carrying out construction

activity on the property" until the case was tried. The Circuit Court granted each motion on 17 March 2000 and 27 March 2000, respectively.

In its answer, filed on 6 April 2000, Petitioner argued that the issuance of the temporary restraining order and the preliminary injunction prevented the construction and marketing of the eight townhouses on the Property, and sought $200,000 in injunction damages in excess of any fair market value condemnation award. In response, the Commission filed two motions *in limine* requesting that Petitioner be prohibited from presenting certain evidence relating to the injunctions. On 12 June 2000, the first day of the condemnation trial, the Circuit Court granted Respondent's motions *in limine*. As to the first motion, the court prohibited Petitioner from presenting evidence of "lost profits, costs, and expenses ... being requested over and above the ... fair market value of the property at th[e] time [of the proceeding]." [1] In the second ruling, the court "preclude[d] any evidence ... with respect to any damages suffered by [Petitioner] as a result of the preliminary injunction." In addition, the Circuit Court granted Respondent's motion for partial summary judgment on the question of public necessity. Following the trial, the jury inquisition awarded Petitioner $320,000 as just compensation for the Property.

On 12 July 2000, Petitioner filed an appeal to the Court of Special Appeals. Pertinent to this case, Petitioner specifically challenged the Circuit Court's orders granting Respondent's motions for injunctive relief and its ruling precluding Petitioner from offering certain damages evidence in the condemnation trial. In an unreported decision, the Court of Special Appeals found no abuse of discretion and affirmed the judgment of the Circuit Court. According to the Court of Special Appeals, the Circuit Court acted within its discretion in granting the injunction and, similarly, did not err in excluding Petitioner's proposed evidence of the impact of the injunctions

---

1. In its brief to this Court, Petitioner conceded the legal correctness of this ruling.

on fair market value at trial. We granted Petitioner's petition for writ of certiorari, *J.L. Matthews, Inc. v. Md.-Nat'l Capital Park and Planning Comm'n*, 365 Md. 472, 781 A.2d 778 (2001), to consider the following questions:

I. Whether the Circuit Court erred in granting the Commission's requests for a temporary restraining order and preliminary injunction prohibiting J.L. Matthews, Inc., from developing its property prior to the condemnation trial.

II. Whether the Circuit Court erred in granting the Commission's second motion *in limine* excluding evidence of damages incurred by J.L. Matthews, Inc., as a result of the temporary restraining order and preliminary injunction.

## I.

### A. Relevant Factual Record

In 1990, Petitioner, J.L. Matthews, Inc.,[2] purchased a 29,238 square foot parcel of land containing a single family home, located at the intersection of Orchard Avenue and Sligo Mill Road in the then Prince George's County portion of the City of Takoma Park ("the City"). At the time, the City was divided between Montgomery County and Prince George's County. After the purchase, Petitioner "pursued the requisite development approvals from" Respondent (a bi-county governmental entity serving Prince George's and Montgomery Counties) and Prince George's County to develop and construct eight townhouses on the Property. In 1994, Petitioner obtained those approvals, but put the development on hold because the housing market was "in a slight slump at that time."

In 1997, Petitioner was "ready to pull [its] building permit and begin construction." On 1 July 1997, however, the City became unified under the jurisdiction of Montgomery County.

---

**2.** The purchaser actually was John L. Matthews individually. By the time of the events relevant to the present case, title to the Property was in J.L. Matthews, Inc., of which Mr. Matthews was President and sole stockholder.

As a result, the portion of the City in which the Property was located became part of Montgomery County.[3] Petitioner, therefore, had to undergo another development review and permit approval process in Montgomery County in order to proceed with its construction plans.[4] This included, in part, "getting exceptions to comply with Montgomery County setbacks," "going through a re-subdivision process to divide ... one site into two lots," and submitting a landscape plan.

On 22 July 1999, Respondent's Montgomery County Planning Board approved Petitioner's preliminary plan of subdivision for the Property. Following that approval, Petitioner obtained sewer connection approvals from the Washington Suburban Sanitary Commission and paid the necessary

---

3. Chapter 636 of the Acts of 1994 provided for the "alteration of the boundary line between Montgomery County and Prince George's County," subject to a referendum of "legally qualified voters" in the City. Chapter 636, Acts of 1994. Pursuant to the Act, if "authorized by a majority of the votes cast in a referendum held in that part of the City ... located in Prince George's County" in November 1995, "all that part of Takoma Park located in Prince George's County" would be "declared a part of Montgomery County." Chapter 636, § 1 of the Acts of 1994. Likewise, the Act also provided for a referendum to be held at the same time in "that part of the City ... located in Montgomery County" to determine whether that part of the City should be "declared a part of Prince George's County." *Id.* If "a majority of votes in both of the referenda" were cast in favor or against changing the boundary, the Act was to become "null and void." *Id.*

 At the referendum held on 7 November 1995, the qualified voters in the part of the City located in Prince George's County voted for alteration of the boundary "to [p]lace [a]ll of Takoma Park in Montgomery County to become part of Montgomery County," and the qualified voters in the part of the City located in Montgomery County voted against alteration of the boundary "to [p]lace [a]ll of Takoma Park in Prince George's County." Chapter 636, § 2 of the Acts of 1994. Therefore, pursuant to the Act, on 1 July 1997 the "county boundary" was "altered ... to place all of the City ... in Montgomery County." Chapter 636, §§ 4 and 8 of the Acts of 1994.

4. Apparently, Petitioner had obtained approval for its building permit in Prince George's County, but had not been issued the permit at the time of the municipal boundary alteration. Had Petitioner been issued its building permit for construction in Prince George's County prior to the "effective date of the boundary alteration," it could have completed its construction "in accordance with the codes, laws, and regulations of Prince George's County." Chapter 636, § 4 of the Acts of 1994.

sewer connection fees for the proposed townhouses. Then, in September 1999, Mr. William Gries, a land acquisition specialist for Respondent, contacted Petitioner and informed it that Respondent "had an interest in acquiring [the Property]" for development of a neighborhood park and that Respondent was having the Property appraised.[5]

Two months later, on 14 December 1999, Mr. Gries sent a letter to Petitioner offering $302,250 for the Property, reflecting "the average of [Respondent's] two appraisal reports, less an amount for the estimated demolition costs associated with the old improvement on the property." The letter indicated that "funds w[ould] not be available to complete this acquisition until after July 1, 1999," but that Respondent was "prepared to enter a Land Purchase Contract . . . to establish[ ] a settlement date no later than July 31, 2000." Petitioner, on 5 January 2000, declined Respondent's offer, citing its "initial costs" in obtaining permits first in Prince George's County and later in Montgomery County and its "expected profit from the project of about 10% over and above the value of the land."

On 4 February 2000, Mr. Gries sent another letter to Petitioner "increasing [the] original . . . offer of $302,250 to $337,700," and advising Petitioner that if it did not accept the offer by February 10th, he would "report to the Montgomery County Planning Board" and would "ask the Board to decide whether or not it wants to use its eminent domain authority to acquire t[he][P]roperty." [6] Petitioner declined that offer as

---

5. In his trial testimony, Mr. Gries indicated that he first learned of Respondent's interest in the Property in January 1999. According to Mr. Gries, "[w]hen the [C]ommission develops its capital budget for acquisition, the budget coordinator will ask the various staff people to make recommendations for land acquisitions that are to be included in the budget." Pursuant to that process, Mr. Gries received a recommendation in January 1999 that the "[P]roperty would be appropriate for acquisition." He took no action, however, until September 1999, when he was instructed to "see if [he] could buy the Matthews' property."

6. Maryland Code (1957, 1997 Repl.Vol.), Article 28, § 5–105, grants Respondent condemnation authority. It provides:

well and informed Mr. Gries that it had applied for a building permit for the Property.[7]

On 10 February 2000, after Petitioner declined Respondent's second offer, the Montgomery County Planning Board of the Commission, in a closed executive session, voted to declare the Property "a desirable property for the purpose of extending the Orchard Avenue Local park . . . [,] approved the staff recommendation to proceed with condemnation to acquire the property, and authorized staff to continue negotiations, authorizing up to a maximum of $350,000.00." Despite the increased authorized acquisition price, however, Mr. Gries made no further offers to Petitioner following the closed session.

Two weeks later, on 24 February 2000, Petitioner applied for and was issued a building permit for the Property by the Montgomery County Department of Permitting Services. Af-

---

Whenever it is deemed necessary by the Commission to take or acquire any lands, water rights, structures, or buildings, either in fee or as an easement, for parks, parkways, forests, roads, streets, boulevards, or highways, ground or spaces, or for the purposes of recreation, the Commission may purchase them from the owner or owners; or, failing to agree with the owner or owners thereof, may condemn the same by proceedings in the circuit court for the county in which the land, water rights, structures, or buildings are located. The procedure shall be that applying to the condemnation of land by public service corporations in Title 12 of the Real Property Article of the Code of Public General Laws of Maryland. At the same time, the Commission may condemn the interest of any tenant, lessee, or other person having an interest in the land or other property. At any time after ten days after the return and recordation of the verdict or award in the proceedings, the Commission may enter and take possession of the property so condemned, upon first paying to the clerk of the court the amount of the award and all costs taxed to date, notwithstanding any appeal or further proceedings on the part of the defendant. At the time of this payment, however, the Commission shall give its corporate undertaking to abide by and fulfill any judgment on such appeal, or on the expiration of the appeal time limit if there be no appeal.

7. At trial, Mr. Matthews testified that Mr. Gries asserted that he would "interfere" with Petitioner's ability to obtain a building permit for the Property. Mr. Gries, however, maintained in his testimony that he "was certain" he did not tell Mr. Matthews "anything about his building permit."

ter obtaining the permit, Petitioner began "to comply with the requirements to build," including trenching the land and erecting silt fencing, having gravel delivered, and communicating with its excavator and its "concrete foundation people." While this was on-going, in March 2000, the Montgomery County Planning Board published its Draft Takoma Park Master Plan, in which it recommended the "acquisition of the Property for a future playground, basketball court, and neighborhood gathering space in the Pinecrest area of Takoma Park."

## B. Procedural History

On 15 March 2000, Respondent filed a complaint in the Circuit Court for Montgomery County for condemnation of the Property. Respondent next filed on 17 March 2000 a motion for temporary restraining order or, in the alternative, motion for preliminary injunction. In that motion, Respondent sought to "prevent [Petitioner] from carrying out construction activity on the Property." According to Respondent, if Petitioner were allowed to continue with the construction activity, it would "destroy the existing trees and vegetation on the site" and might require Respondent to "expend additional public funds to reimburse [Petitioner] for the increased fair market value of the Property, ... [to] remove any improvements constructed, or to replace any vegetation cleared." If Respondent were "required to expend additional public funds," it maintained that it would not "be able to devote those additional funds to acquire and/or develop other parkland within the County for the citizens of Montgomery County." On 17 March 2000, the Circuit Court granted Respondent's motion for a temporary restraining order and enjoined Petitioner "from carrying out any construction activity, including clearing, grading or construction of any kind, on the Property" for a 10 day period.

On 27 March 2000, a hearing was held in the Circuit Court on Respondent's request for a preliminary injunction. At that hearing, Respondent maintained that the circumstances of this case met the four factors commonly applied in determining

whether an injunction should issue.[8] Additionally, Respondent argued, "[t]he fact that the Commission does not have ... quick take authority in fact is what makes it so imperative that [it] obtain a preliminary injunction. . . ."[9] Petitioner, on the other hand, argued that "filing a condemnation affords no rights in any way superior to the property owner," and maintained the court should protect Petitioner's "constitutional property right" by not issuing the injunction. At the close of the argument, the trial judge explained,

> [w]hat appears to me to be at the crux of the issue is that if [Petitioner] were permitted to go forward with the construction, in essence the site would no longer be available to [Respondent].

> And that to me does constitute irreparable injury to the plaintiff, because the site, by virtue of the proposed construction and the additional building, I do believe based upon the evidence that I have heard, would result in significant additional cost to [Respondent] and then would, therefore, result in this site becoming unavailable for its intended use.

---

**8.** Respondent apparently did not believe the nature of the condemnation proceeding commanded different or additional requirements to merit granting its motion for a preliminary injunction. Respondent maintained that the court's determination regarding the injunction should be based on the factors a court generally "must find to exist before it may issue an interlocutory injunction." *Fogle v. H & G Rest., Inc.*, 337 Md. 441, 455, 654 A.2d 449, 456 (1995). Those factors are:
> (1) the likelihood that the plaintiff will succeed on the merits;
> (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal;
> (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and
> (4) the public interest.

*Fogle*, 337 Md. at 455-56, 654 A.2d at 456 (quoting *Dep't. of Transp. v. Armacost*, 299 Md. 392, 404–05, 474 A.2d 191, 197 (1984) (citation omitted)). *But see infra* Part III.C. (discussing the propriety of interlocutory injunctions in condemnation actions).

**9.** See *infra* page 90 for a description of "quick-take" condemnation authority and a comparison of "quick-take" to "regular" condemnation authority.

Based on these findings, the Circuit Court granted Respondent's motion for preliminary injunction and enjoined Petitioner from "carrying out any construction activity, including the clearing, grading or construction of any kind on the Property . . . until such time as there is a final judgment entered" in the condemnation suit.[10]

In its answer filed on 6 April 2000, Petitioner argued that the issuance of the temporary restraining order and the preliminary injunction prevented the construction and marketing of the eight townhouses on the Property, and sought $200,000 in damages in excess of any condemnation award "for injunction damage and harm over and above any award for the land taken." Following Petitioner's answer and request for damages, Respondent filed a motion *in limine* asking the court both to prohibit Petitioner from presenting evidence of "lost profits" and to issue an order directing Petitioner not to introduce evidence of Petitioner's "cost and expenses associated with obtaining regulatory approvals." Petitioner filed a response to that motion arguing that it was entitled to "damages for the taking . . . [and] damage from [Respondent's] injunction which shut down the . . . real estate development project."

On 1 June 2000, Respondent filed a motion to strike or, in the alternative, second motion *in limine*, requesting that the court prohibit evidence of Petitioner's "alleged damages as a result of the issuance of the injunction." Petitioner again filed an opposition maintaining that in condemnation proceedings "the [c]ourt has the power . . . to see that all issues bearing on the issue of just compensation are preserved and presented to the jury for determination." Finally, on 3 June 2000, Respondent filed a motion for partial summary judgment as to the question of "public necessity." Petitioner opposed that motion as well.

---

**10.** As evidenced by the trial judge's explanation, it adopted and relied upon the four factor approach suggested by Respondent in determining whether the injunction should issue. The Court of Special Appeals also utilized these factors in its consideration of the injunction.

At the start of the trial on 12 June 2000, the trial judge heard arguments on both motions *in limine* and on the motion for partial summary judgment. The judge granted Respondent's first motion *in limine,* precluding "additional evidence with respect to lost profits, costs, and expenses that are being requested over and above ... the fair market value of the property at this time," and granted Respondent's motion for partial summary judgment on the issue of public necessity. Of consequence to our consideration of this case, the judge also granted Respondent's second motion *in limine,* stating, "[a]ll right, I am going to grant the second motion *in limine* as well and preclude any evidence at this proceeding with respect to any damages suffered by the defendant [(Petitioner)] as a result of the preliminary injunction." After three days of trial on the fair market value of the Property, the jury returned the inquisition, awarding Petitioner $320,000 as just compensation.

On appeal to the Court of Special Appeals, Petitioner argued the Circuit Court erred in "granting [Respondent's] Motion for Injunctive Relief," "granting [Respondent's] Motion for Summary Judgment," and "precluding [Petitioner] from offering damage evidence in the condemnation trial and/or the injunction hearing." Petitioner also maintained the court erred in its "ruling on the issue of public necessity for the taking" and in its "ruling precluding [Petitioner's] appraisal and engineering witnesses from testifying in the condemnation trial [11]."

In an unreported decision, the Court of Special Appeals affirmed the judgment of the Circuit Court. In so doing, it held that the Circuit Court did not abuse its discretion in granting the injunction and agreed that, "[a]lthough [Petitioner's] injury was its inability to construct eight townhomes on the property, [Respondent] and the public would have suffered irreparable harm through the clearing, grading, excavation,

---

**11.** The Circuit Court precluded Petitioner's witnesses from testifying because it found Petitioner failed to fully comply with the rules of discovery.

removal of existing vegetation, and the possible demolition costs had [Petitioner] not been enjoined." The court also found that the lower court did not err in granting both of Respondent's motions *in limine,* and cited *Smith v. Potomac Elec. Power Co.,* 236 Md. 51, 202 A.2d 604 (1964), for the proposition that speculative damages are not appropriate in condemnation actions.[12] Likewise, the Court of Special Appeals concluded "that the trial court properly granted summary judgment on the issue of public necessity" and determined that "there was ample evidence before the jury upon which to base an adequate damages award."

On 13 September 2001, we issued a writ of certiorari to consider (1) whether the Circuit Court erred in granting the temporary restraining order and preliminary injunction, and (2) whether the Circuit Court erred in granting Respondent's second motion *in limine* excluding evidence of damages incurred by Petitioner as a result of the temporary restraining order and preliminary injunction.[13]

## II.

As a prelude to considering the issues before us, it is useful to revisit some well-settled principles of eminent domain law,

---

**12.** The Court of Special Appeals did not address the two motions *in limine* separately. Rather, the court explained that it would consider whether "the lower court properly grant[ed] [Respondent's] motions *in limine* excluding evidence of ... *lost profits* and evidence of *damages resulting from the preliminary injunction* " (emphasis added), and then proceeded with its analysis, which it presumably intended to apply to both. Although it is clear the Court of Special Appeals affirmed both rulings of the lower court, its rationale for doing so is not. The intermediate appellate court's analysis focused on the first motion *in limine,* prohibiting evidence of Petitioner's lost profits, which the court branded "speculative," and therefore, inappropriate. The court did not consider explicitly the second motion *in limine,* nor did it set forth its rationale for affirming the lower court's granting of that motion.

**13.** Petitioner presented only these two issues in its petition here. It did not include the Circuit Court's grant of partial summary judgment, its preclusion of Petitioner's evidence of lost profits (the first motion *in limine* ), or its ruling precluding Petitioner's appraisal and engineering witnesses from testifying based on discovery violations.

to briefly consider the pertinent statutory elements of condemnation law, and, most importantly, to make clear what is the scope of Respondent's condemnation authority. This will stand as a point of reference in our later consideration of the trial court's grant of the injunction and preclusion of certain evidence in this case.

 Eminent domain, in its simplest terms, is the "inherent power of a governmental entity to take privately owned property ... and convert it to public use...." BLACK'S LAW DICTIONARY 541 (7TH ed.1999). The " 'mode and manner of the exercise of the power' " of eminent domain, however, " 'is exclusively vested in the judgment and discretion of the Legislature,' " *Utilities, Inc. of Md. v. Wash. Suburban Sanitary Comm'n,* 362 Md. 37, 46, 763 A.2d 129, 133–34 (2000) (quoting *Ridgely v. Baltimore City,* 119 Md. 567, 574, 87 A. 909, 912 (1913)), and is not without its limitations. Article III, § 40 of the Maryland Constitution, together with the Fifth and Fourteenth Amendments to the United States Constitution, limit that power by requiring that the taking of private property by governmental entities "be for public use and that just compensation be paid." [14] *Utilities, Inc.,* 362 Md. at 45–46, 763 A.2d at 133 (citing *Green v. High Ridge,* 346 Md. 65, 72, 695 A.2d 125, 128–29 (1997)). *See also* U.S. CONST. amend. V("[N]or shall private property be taken for public use, without just compensation."); U.S. CONST. amend. XIV, § 1 ("[N]or shall any state deprive any person of life, liberty, or property, without due process of law...."); Maryland Code (1958, 1981 Repl.Vol., 2001 Supp.), Constitutions, Article III, § 40 ("The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just

---

**14.** We have "traditionally equated 'just compensation' with 'fair market value of the land....' " *Dodson v. Anne Arundel County,* 294 Md. 490, 494, 451 A.2d 317, 320 (1982) (quoting *State Roads Comm'n v. Warriner,* 211 Md. 480, 485, 128 A.2d 248, 251 (1957)). *See also Dodson,* 294 Md. at 497, 451 A.2d at 321 (" '[J]ust compensation means 'the full and perfect equivalent in money of the property taken' ....' ") (citation omitted). *See infra* pages 88–89 (providing the definition of just compensation applicable in condemnation proceedings initiated by Respondent).

compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."). In addition, many eminent domain statutes also limit the power they bestow on condemning authorities by "provid[ing] that there be a 'necessity' for the taking." *Utilities, Inc.,* 362 Md. at 46, 763 A.2d at 133 (citing *Green,* 346 Md. at 72, 695 A.2d at 129).

As noted at *supra* note 6, Respondent's eminent domain power is provided for in Md.Code (1957, 1997 Repl.Vol.), Art. 28, § 5–105. That section authorizes Respondent to initiate condemnation proceedings to acquire property it has deemed "necessary" for "parks, parkways, forests, roads, streets, boulevards, or highways, ground or spaces, or for the purposes of recreation" if it fails to reach a purchase agreement with the owner of that property. *See* Art. 28, § 5–105. It also mandates that those condemnation proceedings adhere to Title 12 of the Real Property Article of the Maryland Code.[15] *Id.* Because this title contains the statutory scheme applicable to Respondent, we will delineate its requirements within our more general consideration of the condemnation process.

 In a condemnation case, a jury is responsible for determining the amount of just compensation due to the property owner, while "[i]ssues relating to other possible elements, such as the right to condemn, public purpose, or necessity, are exclusively for the judge." *Utilities, Inc.,* 362 Md. at 48, 763 A.2d at 135. *See also Dodson v. Anne Arundel County,* 294 Md. 490, 495, 451 A.2d 317, 320 (1982) ("[T]he jury determines the amount of just compensation in condemnation cases...."). As we explained at *supra* note 14, "just compensation" is traditionally equated with "fair market value." Under § 12–105(b), "fair market value" is defined as "the price as of the valuation date for the highest and best use

---

15. Unless otherwise provided, all statutory references are to Md.Code (1974, 1996 Repl.Vol., 2001 Supp.), Real Property Art., §§ 12–101–12–212. Title 12 enumerates the rules regarding eminent domain and condemnation proceedings, including, for instance, when property is "deemed to be taken" (§ 12–102), the time when the property's value is determined (§ 12–103), and the "damages to be awarded" (§ 12–104).

of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment." In rendering its inquisition, the jury may consider a number of elements that "influence market value," including, "improvements on the land," the "sales of comparable lands," "evidence of reasonable probability of rezoning," and " 'any special features which may enhance [the property's] marketability....' " *Dodson,* 294 Md. at 495, 451 A.2d at 320 (quoting *Brack v. Mayor of Baltimore,* 125 Md. 378, 381, 93 A. 994, 995 (1915)) (citing *State Roads Comm'n v. Warriner,* 211 Md. 480, 484, 128 A.2d 248, 251–52 (1957); *State Roads Comm'n v. Wood,* 207 Md. 369, 373, 114 A.2d 636, 638 (1955); *Pumphrey v. State Roads Comm'n,* 175 Md. 498, 506, 2 A.2d 668, 671–72 (1938)).

As provided in § 12–103, the "value of the property sought to be condemned" is "determined as of the date of the taking, if taking has occurred, or as of the date of trial, if taking has not occurred." Under Title 12, the determination of the "date of taking" is statutorily defined, *see* § 12–102, and is based on the type of condemnation authority the Legislature has granted to the governmental entity seeking to condemn property. If a governmental entity has been given "regular" condemnation authority, a taking occurs when the entity "pays the judgment and costs" assessed in the condemnation trial.[16] § 12–102(2). *See also King v. State Roads Comm'n,* 298 Md. 80, 84–85, 467 A.2d 1032, 1034 (1983) ("No right to possession of the property is obtained until [the entity] pays the full amount of the condemnation judgment, plus costs.") (citing *Walker v. Acting Dir.,* 284 Md. 357, 361, 396 A.2d 262 (1979)). Therefore, pursuant to § 12–103, when an entity has "regular" condemnation authority, the fair market value of the property

---

**16.** Pursuant to Md.Code (1957, 1997 Repl.Vol.), Art. 28, § 5–105, Respondent has "regular" condemnation authority. *See* Md.Code (1957, 1997 Repl.Vol.), Art. 28, § 5–105 (providing Respondent "may enter and take possession of" property after "paying to the clerk of the court the amount of the award and all costs taxed"). Respondent has not been granted "quick-take" authority by the General Assembly.

is assessed by the jury "as of the date of trial" because the taking does not occur prior to the trial. *See* § 12–103 ("[T]he value of the property sought to be condemned ... shall be determined ... as of the date of trial, if taking has not occurred.").

On the other hand, the Maryland Constitution has authorized the Legislature to provide, and the Legislature has so provided, some governmental entities with "quick-take" condemnation authority. *See* Md.Code (1958, 1981 Repl.Vol., 2001 Supp.), Constitutions, Art. III, §§ 40A–40C (granting "quick-take" authority, for different purposes, to Baltimore City, Baltimore County, Montgomery County, Cecil County, the State Roads Commission, and the Washington Suburban Sanitary Commission); *King,* 298 Md. at 86, 467 A.2d at 1035 (" 'Quick-take' condemnation proceedings are authorized in limited circumstances by §§ 40A through 40C of Art. III of the Constitution of Maryland."). Under that authority, "the condemning authority takes possession of the property prior to trial upon payment into court of its estimate of the value of the property taken." *King,* 298 Md. at 86, 467 A.2d at 1035. *See also* § 12–102(1) ("[P]roperty is deemed to be taken ... [when] the required payment has been made to the defendant or into court, any required security has been given, and the [condemning authority] has taken possession of the property and actually and lawfully appropriated it to [its] public purposes.... "). Hence, although a jury determines the fair market value of the property at trial, it bases its determination on the value of the property on the date of taking, rather than on the date of the trial. *See* § 12–103 ("[T]he value of the property sought to be condemned ... shall be determined as of the date of the taking, if taking has occurred.").

In addition to the difference between "regular" and "quicktake" condemnation authority as to the date of taking and date of valuation of property, there is a difference affecting a governmental entity's respective post-condemnation proceeding powers. Specifically, under § 12–109, entities exercising "regular" condemnation authority "retain[ ] the right to abandon the proceedings up until the actual taking of the property

or 120 days after the entry of judgment, unless an appeal is taken." *Utilities, Inc.,* 362 Md. at 47, 763 A.2d at 134. In contrast, an entity exercising "quick-take" condemnation authority may not abandon a condemnation proceeding after judgment is rendered because it already has taken possession of the property.[17] *See* § 12–109(d) ("No condemnation proceeding may be abandoned . . . [a]fter taking has occurred. . . ."). Therefore, regardless of the fair market value a jury in a condemnation proceeding places on condemned property, a condemning authority exercising "quick-take" power remains obligated to pay that amount. An authority relying only on its "regular" power, however, may utilize its option to abandon the condemnation and thereby avoid payment of that amount.

█ Finally, it is important to note that we have "underscore[d] the principle that condemnation actions are exclusive special statutory actions for the exercise of the eminent domain power." *Utilities, Inc.,* 362 Md. at 49 50, 763 A.2d at 135 (citing *Sollins v. Baltimore County,* 253 Md. 407, 252 A.2d 819 (1969)). Thus, the statutory scheme delineating Respondent's condemnation authority informs our consideration of the issues before us.

### III.

### A.

█ Appellate review of a trial court ruling on the admissibility of evidence often is said to be based on the standard that such a ruling is "left to the sound discretion of the trial court," so that "absent a showing of abuse of that discretion, its ruling[ ] will not be disturbed on appeal." *Farley v. Allstate*

---

**17.** Once a condemning authority exercises its "quick-take" power and deposits with the court its estimate of the value of the property taken, the condemnee (the former property owner) "may immediately withdraw the amount . . . and may also recover the amount of any deficiency where the value of the property is later determined at trial to be greater than the amount initially deposited by the condemnor." *King v. State Roads Comm'n,* 298 Md. 80, 86, 467 A.2d 1032, 1035 (1983).

*Ins. Co.*, 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999) (citing *White v. State*, 324 Md. 626, 636–37, 598 A.2d 187, 192 (1991)). Application of that standard, however, depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or on a pure conclusion of law. When the trial judge's ruling involves a weighing, we apply the more deferential abuse of discretion standard.[18] On the other hand, when the trial judge's ruling involves a legal question, we review the trial court's ruling *de novo.* *See Walter v. Gunter*, No. 41, 367 Md. 386, 788 A.2d 609, 2002 Md. Lexis 3, at *5 (2002) ("[O]ur Court must determine whether the lower court's conclusions are "legally correct" under a *de novo* standard of review.") (citing *In re Mark M.*, 365 Md. 687, 704–05, 782 A.2d 332, 342 (2001)); *Register of Wills for Baltimore County v. Arrowsmith*, 365 Md. 237, 249, 778 A.2d 364, 371 (2001) ("[A]s is consistent with our review for all questions of law, we review the order and judgment *de novo.*"). *See also In re Mark M.*, 365 Md. at 704–05, 782 A.2d at 342 (finding that where "a trial court has committed an error of law, [it is] to be reviewed by appellate courts *de novo*"). Likewise, if a court's ruling constitutes a " 'conclusion[ ] of law based upon the facts' " of a case, *Comptroller of the Treasury v. Gannett Co., Inc.*, 356 Md. 699, 707, 741 A.2d 1130, 1134 (1999) (quoting *Cassell v. Pfaifer*, 243 Md. 447, 453, 221 A.2d 668, 672 (1966)), the court's interpretation of the " 'law enjoy[s] no presumption of correctness on review' " and is " 'not entitled to any deference.' " *Gannett Co., Inc.*, 356 Md. at 707, 741 A.2d at 1134–35 (quoting *Rohrbaugh v. Estate of Stern*, 305 Md. 443, 447 n. 2, 505 A.2d 113, 115 n. 2

---

**18.** For instance, under Maryland Rule 5–402, a trial court may exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although at first glance such a determination may appear to be a legal conclusion, at its core it is based on a trial judge's independent weighing of the probative value of the evidence against its harmful effects. As such, it is subject to the abuse of discretion standard.

(1986) (citation omitted); *Oliver v. Hays*, 121 Md.App. 292, 306, 708 A.2d 1140, 1147 (1998)).

■ In this case, it is clear the trial judge based its grant of Respondent's second motion *in limine* on a conclusion of the law. The lower court found that the presentation of evidence of what Petitioner could have done, but for the injunction, and how that might have affected fair market value was not permissible in a condemnation trial. Because it was based on the trial judge's interpretation of the scope of condemnation proceedings, it constituted a legal conclusion. *See infra* Part III.D. (discussing the propriety of the trial court's grant of Respondent's second motion *in limine*). Therefore, we review the trial court's ruling *de novo*.

■ Likewise, although the decision to issue or not issue injunctive relief obviously implicates a court's equitable powers, for which an abuse of discretion standard would be applied ordinarily on appellate review of the exercise of that power (*see Colandrea v. Wilde Lake Cmty. Assoc., Inc.*, 361 Md. 371, 394, 761 A.2d 899, 911 (2000)), the nature of the underlying cause of action in the present case [19], the collateral role played by the injunctive relief in the action [20], and the

---

**19.** As the Court stated in *Utilities, Inc. of Md. v. Wash. Suburban Sanitary Comm'n*, 362 Md. 37, 46–47, 763 A.2d 129, 134 (2000):

Condemnation proceedings are peculiar civil actions and are often described as *sui generis, i.e.,* being the only one of its kind. In Maryland, condemnation proceedings for the acquisition of private property for public use, while regarded as proceedings at law, are not ordinary suits at law. They are 'special proceedings, lacking the characteristics of ordinary trials, brought pursuant to the power of eminent domain. . . .' The power of courts to try condemnation proceedings is not part of the common law jurisdiction of the judiciary. Rather, '[f]ew principles of law are more firmly established that the rule in the field of eminent domain that the court exercises a special statutory jurisdiction. . . .' In fact, a condemnation proceeding may be the quintessential 'special form of remedy for a specific type of case' under the exclusion contained in § 3–409(b) of the Declaratory Judgment Act.

(Alterations in original) (Citations omitted).

**20.** In *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 761 A.2d 899 (2000), the underlying suit was instituted by the community associ-

purely legal question presented by the clash between Petitioner's constitutionally-grounded rights to just compensation and to make a lawful use of its property and Respondent's attempted substitution of injunctive relief for its inability to use "quick-take" condemnation authority, lead us to conclude that *de novo* review is the proper standard to apply to Petitioner's threshold question.

## B.

Petitioner asserts the trial court erred in granting Respondent's motion for a temporary restraining order and preliminary injunction, and that it subsequently erred in granting Respondent's second motion *in limine* excluding evidence that the temporary restraining order and preliminary injunction affected the fair market value of the Property as of the trial. According to Petitioner, the injunctive relief obtained by Respondent "froze the value of the subject property" prior to the date of trial and therefore, "conflict[ed] with the statutory scheme adopted by the General Assembly" which grants Respondent only "regular" condemnation authority. Although Petitioner acknowledges that injunctive relief may be appropriate in some circumstances in a condemnation matter, it maintains that "it [i]s not appropriate in this case where the primary purpose was to preserve the physical condition of the property and freeze the fair market value of the land to avoid additional expense." Likewise, Petitioner also argues that by "granting the motion *in limine*," the lower court denied it "the

---

ation specifically and solely requesting injunctive relief to enforce restrictive covenants in a planned community. *Colandrea,* 361 Md. at 379, 761 A.2d at 903. In determining that an abuse of discretion standard was appropriate on appellate review of the issuance of the requested injunction in that case, the Court explained that "[t]he trial court *ordinarily* has the discretion to grant or deny a request for injunctive relief *in general equity matters of the type here involved* and that decision is reviewed by this Court under an 'abuse of discretion' standard." *Colandrea,* 361 Md. at 394, 761 A.2d at 911 (emphasis added) (citations omitted). In the instant case, the taking of Petitioner's property through eminent domain is not a "general equity matter" of the type involved in *Colandrea.*

right to present testimony as to what the fair market value of the ... [P]roperty would have been on the date of trial, the statutorily prescribed valuation date." Petitioner contends that it was denied its constitutional right to just compensation for the taking of the Property by the "manipulat[ion of] the valuation date via injunctive relief" and the "exclu[sion of] evidence it incurred as a result thereof." Therefore, Petitioner urges us to reverse the judgments of the courts below.

Respondent, on the other hand, maintains that it "had full authority under the Maryland Rules" to seek an injunction in this case. It also argues the record below provides "ample evidence to demonstrate" that Petitioner's intended actions would constitute " 'destruction, misuse, or alienation' " of the land justifying a preliminary injunction under *Washington Suburban Sanitary Comm'n v. Nash*, 284 Md. 376, 396 A.2d 538 (1979).[21] Regarding the preclusion of evidence, Respondent contends that the motion *in limine* "only precluded evidence related to damages arising out of the injunctions, and did not limit evidence with respect to fair market value." (Emphasis omitted). According to Respondent, Petitioner "simply failed to present this testimony at trial," and hence, should not be able to "use this separate measure of damages to compensate for [its] failure to produce expert testimony with respect to valuation at trial."

We agree with Petitioner that the Circuit Court erred in granting the temporary restraining order and preliminary injunction. We also agree that the Circuit Court's grant of Respondent's second motion *in limine* wrongfully precluded Petitioner from presenting evidence that may have affected the jury's assessment of the fair market value of the land at the time of trial. Therefore, we reverse the judgments of the Court of Special Appeals and the Circuit Court.

---

**21.** See *infra* pages 98–104 describing *Washington Suburban Sanitary Comm'n v. Nash*, 284 Md. 376, 396 A.2d 538 (1979), and its application to the case at hand.

## C.

 Prior to commencement of the condemnation trial in this case, the Circuit Court granted Respondent's motion for a temporary restraining order, and later for a preliminary injunction, prohibiting Petitioner "from carrying out any construction activity ... on the Property." The injunction expired by operation of its facial terms on 15 June 2000, the day final judgment was entered on Respondent's complaint for condemnation. Because the injunction expired well prior to this case coming before us, the propriety of the injunction ordinarily would be a moot issue. *See Bd. of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027, 1033 (1999) ("A question is moot 'if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.' ") (quoting *Attorney Gen. v. Anne Arundel County Sch. Bus Contractors Assoc., Inc.,* 286 Md. 324, 327, 407 A.2d 749, 752 (1979)).

 Generally, we dismiss moot questions "without expressing our views on the merits of the controversy." *Mercy Hosp., Inc. v. Jackson,* 306 Md. 556, 562, 510 A.2d 562, 565 (1986). We have the constitutional authority, however, to express our views on the merits of a moot case, *see id.; Baltimore Sun Co. v. State,* 340 Md. 437, 454, 667 A.2d 166, 174 (1995) (citing *Mercy Hosp., Inc.*), and will exercise that authority in instances where:

the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest.... If the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.

*Lloyd v. Bd. of Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954). *See also Mercy Hosp., Inc.,* 306 Md. at 562–63, 510 A.2d at 565 (quoting *Lloyd).* •

Although the propriety of an interlocutory injunction may not always evade appellate review,[22] the exercise of eminent domain involves one of the fundamental "relationship[s] between government and its citizens." *Lloyd,* 206 Md. at 43, 111 A.2d at 382. In this case, Respondent maintains that because it does not have "quick-take" authority, it is entitled to injunctions prior to condemnation proceedings to "protect the *status quo* of real estate." Respondent relies on *Washington Suburban Sanitary Comm'n v. Nash,* 284 Md. 376, 396 A.2d 538 (1979), to support that contention and to support the grant of the temporary restraining order and preliminary injunction under the facts and circumstances of this case. Respondent's arguments necessitate that we consider and comment again on the use of injunctions by condemning authorities lacking "quick-take" power.

Recent history indicates that condemning authorities interested in obtaining "quick-take" authority consistently have been denied that objective by the voters.[23] Because of these failed attempts, there may be a lingering appetite among

---

**22.** Under Md.Code (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Art., § 12–303(3)(i), a party may appeal from an interlocutory order entered by a circuit court in a civil case granting an injunction, so long as the appellant has "first filed his answer in the cause."

**23.** The "Editor's note" following § 40A of Art. III of the Maryland Constitution reveals many failed attempts to gain "quick-take" authority by a number of county councils. Chapter 674, Acts of 1988, proposed to grant "quick-take" authority to the Anne Arundel County Council when the County Council found "an immediate need for the property for right of way for municipal roads, or streets, water, sewer or storm drain facilities." The act, however, "failed of ratification" at the referendum held on 8 November 1988. *See* Md.Code (1958, 1981 Repl.Vol., 2001 Supp.), Constitutions, Art. III, § 40A, Editor's note. Similarly, Chapter 83, Acts of 1996, proposed to provide "quick-take" authority to the County Council of Harford County when "there is an immediate need for the property for a right of way for road, storm drain, sewer, or water construction or installation." This act also failed

condemning authorities lacking "quick-take" power to seek injunctions as a substitute, as Respondent did here. Thus, it is "imperative and manifest" that we review the propriety of the injunctions here in order to offer some guidance to other condemning authorities how to operate within the breadth of their "regular" authority.

 Respondent, at trial, maintained that the lower court's determination whether to issue the preliminary injunction should be based on four traditional factors often applied in determining whether an interlocutory injunction is appropriate. *See supra* note 8 (listing the factors of the likelihood that the plaintiff will succeed on the merits, the "balance of convenience," whether the plaintiff will suffer irreparable injury unless the injunction is granted, and the public interest). Our decision in *Nash*, however, made clear that a court should not rely solely on those factors in cases where a condemning authority seeks injunctive relief to prevent a property owner from developing his, her, or its property prior to a condemnation trial.

In *Nash*, the Washington Suburban Sanitary Commission ("the WSSC") initiated condemnation proceedings to obtain a privately-owned tract of land on which it planned to build a sludge composting facility. Prior to the WSSC filing the petition for condemnation, however, the property owner contracted with a third party for the removal and sale of the standing timber on the property. Upon filing its petition, the WSSC did not "attempt to take the property immediately through a 'quick take' procedure," [24] but sought an injunction

---

of ratification at a referendum. *See id.* Recently, Chapter 205, § 3 of the Acts of 2000, proposed to grant "quick-take" authority to the County Council of Prince George's County when the County Council found "an immediate need … for redevelopment" on property located between "the Suitland Federal Center and Silver Hill Road and within two of the following areas[-]a revitalization tax district, an enterprise zone, or a priority funding area." This act, however, "was rejected by voters of the State at the election held on" 7 November 2000. *See id.*

24. In oral argument, the WSSC explained that it "was not sure whether 'quick take' was available to it." *Nash*, 284 Md. at 379 n. 3, 396 A.2d at

to prevent the third party buyer from cutting or removing any of the trees on the land. *Nash*, 284 Md. at 378, 396 A.2d at 539. The Circuit Court refused to grant the injunction and we subsequently affirmed the denial on appeal.[25]

We first noted that a taking had not occurred, under either "quick-take" or "regular" powers.[26] *Nash*, 284 Md. at 380, 396 A.2d at 540. Hence, we explained, the "mere filing of the condemnation petition gave [the WSSC] no rights in the land," and the property owner "was still free to use the land, enjoy it or dispose of it as before." *Nash*, 284 Md. at 381, 396 A.2d at 541. In our view, imposing the injunctive relief would have caused Nash and the third party buyer to "suffer severe interferences ... [,] tantamount to deprivations of their use and enjoyment of the property," and would have allowed the WSSC to "obtain [the] substantial rights and benefits it would receive under a 'quick take,' ... without incurring any of the obligation incident to that procedure." *Nash*, 284 Md. at 382, 396 A.2d at 541. After considering the "precise scheme for the acquisition of land and interests in land" provided for in the Maryland Constitution, the Maryland Code, the Maryland

---

540 n. 3. For the "purpose of decision on th[e] appeal," however, the WSSC "posited ... that it did not have ['quick take'] power, as, in any event, it had chosen not to proceed under an immediate taking." *Nash*, 284 Md. at 383, n. 5, 396 A.2d at 541, n. 5. In our decision, we expressed "no opinion [as to] whether the WSSC had the power to 'quick take' " under the circumstances. *Id.* Hence, our holding was not based, as Respondent suggests, on the WSSC's failure to utilize any such power.

**25.** This represents a simplification of the complicated procedural history of *Nash*. *See Nash*, 284 Md. at 379–80, 396 A.2d at 539–40. The omitted portion of procedural history, however, did not effect the outcome in *Nash* and has no bearing on our interpretation of *Nash* for purposes of this case.

**26.** As we explained in *Nash*, there was no "quick-take" because the WSSC did not fulfill the "three requisites of a taking under such procedure-payment made; security, if any required, given; and possession taken with actual appropriation to the public purpose...." *Nash*, 284 Md. at 380, 396 A.2d at 540. Likewise, the WSSC did not take the property under "regular" condemnation authority because "the condemnation action ... had not gone to trial, and there was no judgment and costs as yet to be paid." *Id.*

Rules of Procedure, and other relevant codes, we also observed that the public and the Legislature "were especially cautious" that the taking power "bestowed [on the WSSC] be so restricted that the rights of owners thus deprived of their property would be adequately safeguarded." *Id.* Therefore, because the injunction would "have effectively thwarted the carefully devised scheme" for the acquisition of land by the WSSC, we affirmed its denial. *Nash,* 284 Md. at 382–83, 396 A.2d at 541.

*Nash* made clear that in a "regular" condemnation proceeding, a property owner is free to use his or her land in any lawful manner prior to a condemning authority's taking of the land and that, therefore, an injunction to the contrary ordinarily is inappropriate in such circumstances. In a footnote at the end of the opinion, however, we provided that

it does not necessarily follow from our holding on this appeal, which is predicated on the particular circumstances here existent, that injunctive relief would not be available in any case to prevent the destruction, misuse, or alienation of land or an interest therein to the detriment of the condemnor. Whether such relief would be appropriate is to be determined on a case to case basis upon a balancing of the rights of the condemnor with the rights of the condemnee.

*Nash,* 284 Md. at 383 n. 5, 396 A.2d at 541 n. 5. In *Nash,* however, the removal of standing timber from a property intended to become a sludge-composting facility failed to meet the standard of "destruction, misuse, or alienation of land." The record in the present case must be reviewed against that standard.

In its argument to the Circuit Court, Respondent pointed to a number of general effects Petitioner's intended development of the Property could have, including the "destruction to the trees and vegetation," increased costs of acquisition due to the "cost of the improvements," and increased costs due to the "cost of their demolition." Respondent now maintains that those effects constitute "precisely the factual circumstances that would justify injunctive relief as

contemplated in footnote five of *Nash.*" We disagree. Even if the trial court had applied the conditions discussed in the footnote in *Nash* in considering the injunction request, instead of erroneously relying on the factors cited by Respondent in granting the injunction, *see supra* note 8, the factual findings in this case and Respondent's proof would not qualify for the injunctive relief exception contemplated in *Nash.*

Specifically, in Respondent's motion for preliminary injunction, Respondent explained that "if [Petitioner] is not restrained from carrying out construction activity on the Property, the construction activity will destroy the existing trees and vegetation on the site ... [which] will cause the Commission and the citizens of Montgomery County irreparable harm." At the hearing on Respondent's request for preliminary injunction, however, Respondent's witness, Mr. William E. Gries, acknowledged that Respondent did not "have specific plans" regarding the Property and did not know "how many trees on the site, if any, would be preserved if and when the [P]roperty" was developed. Although Mr. Gries indicated that Respondent intended to put "a basketball court," "a playground ... for the nearby residents," and "an attractive gathering space" on the Property, he admitted there were no plans, beyond "conceptual plans," regarding where the facilities would be located on the Property. According to Mr. Gries, the "[M]aster [P]lan for Takoma Park," which recommended the "acquisition of the Property for a future playground, basketball court, and neighborhood gathering space in the Pinecrest area of Takoma Park," *see supra* page 82, had not yet "been adopted." [27]

---

**27.** The record does not reveal that Mr. Gries's testimony was based on a comparison of Petitioner's approved development plans against any detailed or specific plans for Respondent's intended use of the Property. Absent such a comparison, it would seem he would have no basis to testify with greater specificity as to the effect of Petitioner's plans on Respondent's future intentions as to the Property. Apparently Respondent's plans for the Property were in the "conceptual," rather than "specific," stage of development. Moreover, Mr. Gries did not identify any specific trees or vegetation that may have been subject to removal

Based on the evidence offered by Respondent, we fail to see how, "upon a balancing of the rights" of Respondent with the rights of Petitioner (*Nash,* 284 Md. at 383 n. 5, 396 A.2d at 541 n. 5), Respondent satisfied the threshold standards of the *Nash* footnote. Petitioner's right to develop the Property and to just compensation greatly outweighs Respondent's speculative showing as to its interest in retaining the affected trees and vegetation on the Property. Respondent admittedly had only a "conceptual" plan of "what it intends to do with the [P]roperty," and that was only in "draft form." The terms of the *Nash* footnote were not designed to protect condemning authorities from the effect of "what-ifs" and "maybes." Moreover, it is not within the province of the courts to postulate as to the effect Petitioner's development *might* have on Respondent's unsettled plans.

Curiously, at the 27 March 2000 hearing on the preliminary injunction request, the trial judge stated that he "was not persuaded that the loss of trees and the loss of vegetation would be something that would be irreparable." Yet, in the 27 March order issuing the injunction, the court contradictorily concluded that "the destruction of the natural vegetation on the Property" constituted an immediate, substantial and irreparable harm. Although we may conceive of circumstances in which the removal of natural vegetation may qualify as the "destruction, misuse, or alienation of land," the record of the present case fails to demonstrate the level of extraordinary or exceptional circumstances implied by the *Nash* footnote.

As to the alleged increased costs to Respondent which might result from Petitioner's construction activities on the Property, Respondent, in its motion for preliminary injunction, maintained that,

if [Petitioner] is not restrained from carrying out construction activity on the Property, [Respondent] *may* be required to expend additional public funds to reimburse [Petitioner]

---

under Petitioner's approved plans as being of specimen quality, unique, rare, or otherwise notable examples of their kind.

for the increased fair market value of the Property, and *may* also be required to expend additional public funds to remove any improvements constructed, or to replace any vegetation cleared, on the Property.

If [Respondent] is required to expend additional public funds [for those costs] ..., Respondent will not be able to devote those additional funds to acquire and/or develop other parkland within the County for the citizens of Montgomery County.

(Emphasis added). At the hearing on the injunction, however, Mr. Gries acknowledged that Respondent did not know "what the costs w[ould] be." In addition, Mr. Gries was also unable to "point to" other "specific parks" that Respondent would "be precluded from acquiring or developing if it h[ad] to spend some money" on the Property. According to Mr. Gries, the "irreparable and substantive injury or harm" which Respondent would suffer if Petitioner proceeded with its development plans was losing potentially "the opportunity to provide a park at a location that [Respondent] feel[s] is important for serving th[e] community."

■ Regarding Respondent's assertion of increased costs, we again are unable to find that the proof in this case rises to the level of the exceptional or extraordinary circumstances intended under the *Nash* footnote. The unquantified increased acquisition costs that *might* be incurred by Respondent, attributable to the *potentially* increased fair market value, the costs of removing any construction Petitioner completed that *might* be inconsistent with Respondent's intended park use of the Property, and the costs of replacing vegetation that *may* be desired in Respondent's park plans, do not justify holding Respondent's rights superior to those of Petitioner. The "destruction, misuse, or alienation of land," as provided in *Nash*, contemplates more than a potential increased out-of-pocket expense to a condemning authority. Respondent's speculative evidence regarding the costs it "may" incur and monies it "might" be required to expend falls far short of the

degree of specificity required to come within the *Nash* footnote.

 Additionally, according to Respondent, "the fact that [it] does not have ... quick-take authority ... is what makes it so imperative that [it] obtain a preliminary injunction" to "protect the *status quo* of real estate." Respondent's lack of "quick-take" authority, however, is *precisely* what mandates that it generally *not* be granted preliminary injunctions in condemnation cases. A condemning authority is not entitled to utilize injunctive relief as a means of preserving its financial valuation of private property. To permit otherwise in a typical condemnation case, such as the present one, would wholly circumvent the Legislature's "precise scheme for the acquisition of land," *Nash*, 284 Md. at 382, 396 A.2d at 541, which grants Respondent only "regular" condemnation authority.[28] *See supra* note 16.

 In conclusion, *Nash* provides that a condemning authority with "regular" condemnation power possibly may obtain a temporary restraining order and/or a preliminary injunction in exceptional or extraordinary circumstances to prevent the detrimental "destruction, misuse, or alienation of land." The circumstances here do not meet the high bar imposed by the exception outlined in *Nash;* therefore, the Circuit Court erred in granting the temporary restraining order and preliminary injunction in this case.

---

**28.** As noted at *supra* pages 89–90, Respondent's "regular" condemnation authority mandates that, in all condemnation cases involving Respondent, the fair market value of subject property be assessed by the jury *as of the date of trial,* and provides that Respondent does not "take" condemned property until it pays the judgment and costs assessed in the trial. Up until that time, a property owner is free to use the property as he, she, or it normally would, including making improvements and developments on the land. By obtaining an injunction in this case, however, Respondent prevented Petitioner from exercising those rights prior to the condemnation proceeding and, therefore, artificially set the fair market value of the Property as of the date of the injunction. That act is in total contravention of the tenets of established condemnation law. See discussion at *infra* Part III.D.

### D.

Because the impropriety of the long-expired injunctive relief is moot and, therefore, we are not able to fashion direct relief for that error, we shall proceed to consider Petitioner's second issue, the asserted erroneous grant of Respondent's second motion *in limine*. Had the trial judge denied that motion, the prejudicial effect of the improper injunctions would have been mitigated. If we conclude the court erred in granting that motion, it is nonetheless possible to grant Petitioner some relief under the circumstances.

Prior to determining whether the Circuit Court erred, we first must ascertain exactly what evidence the trial judge precluded by his ruling. After hearing arguments on the second motion *in limine,* the trial judge stated, "[a]ll right, I am going to grant the second motion *in limine* as well and preclude any evidence at this proceeding with respect to any damages suffered by the defendant [(Petitioner)] as a result of the preliminary injunction." Respondent maintains this ruling "went only to the issue of injunctive damages" and "did NOT limit evidence with respect to fair market value." Petitioner, on the other hand, makes no such distinction and argues the ruling precluded it from presenting "evidence as to how far [it] would have been in the construction phase," but for the injunction. According to Petitioner, it should "have been permitted to present evidence of the effect of the improvements (even if incomplete) on the fair market value of the property as of the date of trial."

Under the trial judge's ruling, it is clear that Petitioner's inability to develop the Property during the period between 17 March and 15 June (some 3 months) was a direct "result of" the injunction. We find no language in the ruling, however, indicating that such evidence, even though a "result of" the injunction, was exempt from the scope of the court's preclusion. Therefore, we agree with Petitioner that the ruling fairly could be construed, and in fact was taken to mean, that Petitioner was precluded from presenting evidence of what it would have done on the Property, but for the injunction, and

how that development may have influenced the Property's fair market value at the time of the jury assessment.[29]

Upon holding that the trial judge's ruling precluded a category of evidence that might bear the fair market value of the Property as affected by the injunction, we now must determine whether the trial court erred in precluding that evidence at trial. For the following reasons, we agree with Petitioner that, to ensure it received just compensation for the Property, it should have been permitted to present such evidence at trial.

As we explained in *supra* Part II., until Respondent paid "the judgment and costs" determined by the jury at trial, Petitioner retained title to the Property, and, as its owner, was permitted to do with the Property whatever it lawfully could. *See* §§ 12–102(2), 12–108(a). In this case, however, the grant of the temporary restraining order and preliminary injunction prevented Petitioner from exercising that right, specifically from continuing its development of the Property. As a result, the Property's fair market value was determinable as of the date of the initial injunction (17 March 2000), not the date of trial (15 June 2000). The jury determination of the Property's fair market value was constrained to the value of the Property as of the date of the initial injunction. This was error.

---

**29.** Respondent's argument that Petitioner "could have" put on such evidence is not persuasive. It is well-established that after the judge's preclusion of the evidence in question, Petitioner was not required to proffer that evidence at trial. *See Reed v. State*, 353 Md. 628, 637–38, 728 A.2d 195, 200–01 (1999) (" '[W]hen the effect of the ruling [on a motion *in limine*] is to exclude the evidence, and the trial judge intends that ruling to 'be the final word on the matter, a contemporaneous objection made at the time of the ruling ordinarily preserves the issue for appellate review.'... When motions *in limine* to exclude evidence are granted, normally no further objection is required to preserve the issue for appellate review.' ") (first alteration in original) (quoting *Hickman v. State*, 76 Md.App. 111, 117, 543 A.2d 870, 873 (1988)) (citing *Simmons v. State*, 313 Md. 33, 37–38, 542 A.2d 1258, 1259–60 (1988)). *See also Prout v. State*, 311 Md. 348, 356, 535 A.2d 445, 449 (1988) (holding that when a trial judge determines that "questionable evidence will *not* be admitted," the "proponent of the evidence is left with nothing to do at trial but follow the court's instructions"). Hence, contrary to Respondent's argument, there was no need or occasion for Petitioner to offer such evidence after the trial judge's ruling.

Under both the Maryland Constitution and the United States Constitution, Petitioner is entitled to just compensation for property taken by Respondent. In those circumstances, just compensation is equal to the fair market value of the property and is determined by a jury at the conclusion of the condemnation trial. *See supra* page 90. By obtaining the injunction in this case, however, Respondent was able to control Petitioner's lawful action on the Property, and by extension, was able artificially to constrain determination of the fair market value of the Property. Although the jury determination of fair market value was made *at* trial, it was based on the value of the Property as set by conditions (not agreed to by Petitioner) on a date *before* trial. That is in direct contravention of Petitioner's rights and is wholly inconsistent with the scope of Respondent's condemnation authority.

If the injunction had not been granted in this case, the jury's determination of just compensation for the Property at trial would have included and reflected any development Petitioner had completed on the Property. *See Dodson,* 294 Md. at 495, 451 A.2d at 320 ("The jury may properly consider various elements that influence market value at the time of the taking in its determination of damages ... [including] improvements on the land ....") (citations omitted); *Pumphrey,* 175 Md. at 506, 2 A.2d at 671–72 (explaining that "in determining the fair market value of the land" the "improvements thereon [is a] relevant fact[ ] to be weighed and considered"). Petitioner's right to just compensation in this case, therefore, necessitated that it be permitted to present similar evidence at trial. Respondent should not have been permitted to utilize the effect of the injunction to override Petitioner's constitutional and statutory right to just compensation for the Property. Therefore, although the injunction prevented Petitioner from proceeding with its development of the Property, it was entitled to produce evidence before the jury of what lawful improvements it would have made on the Property, but for the injunction, and how those improvements may have increased the Property's fair market value on the date of trial

As we explained in *supra* Part III.C., Respondent has not been accorded "quick-take" condemnation authority in our Constitution, which would permit it to "take" property prior to establishment of its valuation, *see* § 12–102(1), and cannot use an injunction as a surrogate for that power. Our holding here reflects that declaration by counteracting Respondent's attempt to fix prematurely the fair market value of the Property.

It is also worth noting that we have adopted a similar rationale in a number of cases concerning the use of amendments to zoning ordinances by governmental entities to depress property value prior to condemnation proceedings.[30] *See, e.g., Mayor of Baltimore v. Kelso Corp.*, 281 Md. 514, 520, 380 A.2d 216, 220 (1977); *Carl M. Freeman Assocs., Inc. v. State Roads Comm'n of Md.*, 252 Md. 319, 329–30, 250 A.2d 250, 255 (1969). In those cases, we held that an entity could not "use zoning to depress land values so as to reduce the damages paid by the sovereign when it otherwise validly invoke[d] its power to condemn." *Kelso Corp.*, 281 Md. at 520, 380 A.2d at 220 (citing *Arnold v. Prince George's County*, 270 Md. 285, 294–95, 311 A.2d 223, 228–29 (1973); *Hoyert v. Bd. of County Comm'rs*, 262 Md. 667, 672–74, 278 A.2d 588, 591–92 (1971); *Carl M. Freeman Assocs., Inc.*, 252 Md. at 329–30, 250 A.2d at 255; *Krieger v. Planning Comm'n*, 224 Md. 320, 323–24, 167 A.2d 885, 887 (1961); *Cong. Sch. of Aeronautics, Inc. v. State Roads Comm'n of Md.*, 218 Md. 236, 241, 146 A.2d 558, 560 (1958)). "[T]he date of valuation set by statute," we explained, "cannot be used to deprive a property owner of the just compensation he is entitled to receive under" the Maryland Constitution. *Kelso Corp.*, 281 Md. at 519, 380 A.2d at 219.

---

**30.** In the "dezoning," or "downzoning," cases, governmental entities rezoned subject property to classifications with substantially lower market values prior to the filing of condemnation actions. This had the effect of lowering the fair market value of the property at the time of the condemnation proceedings, thereby reducing the amount of just compensation the condemning authorities had to pay for the property.

In addition, we also noted that, "[t]he property owner must be protected from prejudicial evidence as to value based on restrictions on the use of his property unconstitutionally impressed as part of a design to freeze or depress its value." *Carl M. Freeman Assocs., Inc.*, 252 Md. at 329–30, 250 A.2d at 255. Therefore, we found a property owner is "entitled to show, if it can, the probability that the land would be rezoned within a reasonable time after the condemnation" to a higher value, and "the effect of such a probability upon the property's value at the time of taking." *Kelso Corp.*, 281 Md. at 520, 380 A.2d at 220.

Our reasoning here follows the analysis set forth in the "downzoning" cases. As we explained at *supra* page 108, the injunction prevented Petitioner from doing what it lawfully was entitled to do on the Property through the date of trial. That prohibition thereby may have depressed wrongfully the Property's value, as potentially would a rezoning classification, compared to what it would have been, but for the injunction. Thus, "in light of the constitutional right of the property owner to receive just compensation for [its] property," we must confirm Petitioner's ability to present evidence regarding the fair market value of the Property as affected by the injunction. *Carl M. Freeman Assocs., Inc.*, 252 Md. at 329, 250 A.2d at 255.

Accordingly, we conclude that the facts of this case do not amount to the extraordinary or exceptional circumstances we contemplated as authorizing an injunction in the footnote in *Nash*. The Circuit Court, therefore, erred in granting Respondent's motion for a temporary restraining order and a preliminary injunction prior to the condemnation hearing. Similarly, because the injunction in this case hindered Petitioner's statutory and constitutional right to seek just compensation for its property, we also hold that the Circuit Court erred in prohibiting Petitioner from presenting evidence at trial of what it would have done on the Property, but for the injunction, and how that development may have increased the Property's fair market value at the time of trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE IN PART AND AFFIRM IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR A NEW TRIAL AS TO THE AMOUNT OF JUST COMPENSATION; RESPONDENT TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*

RAKER, J., dissents.

RAKER, Judge, dissenting.

I respectfully dissent. I would affirm the judgment of the Court of Special Appeals affirming the Circuit Court for Montgomery County.

While I agree that, under *Washington Sub. San. Comm'n v. Nash*, 284 Md. 376, 396 A.2d 538 (1979), a condemning authority with "regular" condemnation power may obtain a temporary restraining order or preliminary injunction only under exceptional circumstances, I believe that such circumstances are present in this case. Although preservation of the fair market value of the subject property was not an appropriate justification for granting the preliminary injunction, the removal of the existing trees and vegetation from the proposed park site would have constituted the detrimental "destruction, misuse, or alienation" of the land for the use for which it was intended. *See id.* at 383 n. 5, 396 A.2d at 541 n. 5. While removal of standing timber from a property intended to become a sludge-composting facility failed to meet this high standard, the destruction of the natural vegetation on a proposed park and the erection of improvements in its place constitute precisely the type of irreparable harm that would justify injunctive relief as contemplated in *Nash*. In addition, there is no reason to require, as a condition of obtaining injunctive relief, that the plant specimens removed from the property be "unique, rare, or notable examples of their kind." *Cf.* maj. op. at 101–02 n. 27.

I also agree with the majority that, in order to ensure that petitioner received just compensation for the property, it should have been permitted to present evidence of what it would have done to the property, absent the injunction, and how that development would have influenced the property's fair market value at the time of trial, the statutorily prescribed valuation date for determining just compensation for the taking of the property. Where I disagree is with the majority's contention that, by granting the motion *in limine,* the lower court denied petitioner the right to present testimony as to what the fair market value of the property, including improvements, would have been at the time of the jury assessment. The motion *in limine,* by its own terms, only precluded evidence relating to damages *resulting from the injunction* and did not limit evidence with respect to fair market value. Petitioner simply failed, of its own volition, to present expert testimony with respect to valuation at trial.

Moreover, under our well-established precedent, in order to preserve its objection to the granting of the motion *in limine,* petitioner was required to make a proffer of the evidence at trial. *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445, 449 (1988), recognizes an exception to this requirement where the trial judge "clearly determin[es] that the questionable evidence will *not* be admitted, and ... instruct[s] counsel not to proffer the evidence again during trial ..." leaving the proponent of the evidence "with nothing to do at trial but follow the court's instructions." *Id.* at 356, 535 A.2d at 448. That is not what happened in this case. The case *sub judice* is a perfect example of why the proponent of the disputed evidence must proffer the evidence at trial. If there was a misunderstanding as to the trial court's ruling, it could have been clarified, and the precise scope of the judge's ruling would have been clear. Under my reading of the trial court's ruling, petitioner would have been permitted to offer the evidence. This is not a *Prout* case, in which the trial court clearly determined that the questionable evidence would not be admitted and instructed petitioner not to offer it. Petitioner simply failed to offer the

evidence as it was required to do and failed to preserve the issue for appellate review.[1]

Accordingly, I respectfully dissent.

---

1. The majority also cites *Reed v. State*, 353 Md. 628, 728 A.2d 195 (1999), which affirmed the continuing viability of the contemporary objection rule. *Reed* is inapposite. That case dealt with the requirement that an opposing party make a contemporaneous objection to the *admission* of challenged evidence after a trial court's *denial* of a motion *in limine* to exclude it.